UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CELESTE SPICER, AUTUMN BURGESS, AMY LEDIN, JOSEPH RUSSO, ESTHER MARTINEZ, LYSETTE ROMAN, and SERENA SIYING HUI, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>PIER SIXTY, LLC and JAMES KIRSCH,<br><br>Defendants. | 1:08-CV-10240 (LBS) |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants Pier Sixty, LLC ("Pier Sixty") and James Kirsch (collectively, the "Defendants") submit the following statement of undisputed material facts in support of their motion for summary judgment in connection with the above-captioned matter, filed by plaintiffs Celeste Spicer, Autumn Burgess, Amy Ledin, Joseph Russo, Esther Martinez, Lysette Roman, and Serena Siying Hui (collectively, the "Plaintiffs"):

**Background**

1. Pier Sixty operates two of New York's most prestigious banquet facilities – Pier Sixty and the Lighthouse – both of which are located within the Chelsea Piers sports and entertainment complex in Manhattan. See Affidavit of Douglas Giordano in Support of Defendants' Motion for Summary Judgment ("Giordano Aff."), ¶ 2.

2. A multitude of events are held at Pier Sixty, including corporate events, social events (e.g., weddings, bar/bat mitzvahs), and charitable and fundraising events. See Giordano Aff. ¶ 3.

**Organizational Structure**

3. Douglas Giordano is Pier Sixty's General Manager, and has served in that capacity since 2000. See Giordano Aff. ¶ 1. Mr. Giordano is the top-level employee at Pier Sixty, and has the ultimate responsibility for overseeing Pier Sixty's operations. Id. at ¶ 4. He maintains all of the daily operational control over Pier Sixty, and does not receive management directives from any of the individuals who have an ownership interest in Pier Sixty, including Kirsch. Id.

4. Meredith Barsky is Pier Sixty's Director of Catering, and has served in that capacity since mid-2007. See Affidavit of Meredith Barsky in Support of Defendants' Motion for Summary Judgment ("Barksy Aff."), ¶ 1. Prior to that time, she served as a Sales Manager for Pier Sixty dating back to its inception in or around 1997. Id. As the Director of Catering, Barsky handles the booking of various events for Pier Sixty's customers, as well as supervises Pier Sixty's Sales Managers who also book events for Pier Sixty. Id.

5. Jeff Stillwell is Pier Sixty's Director of Banquet Services at Pier Sixty, LLC ("Pier Sixty"), and has served in that capacity since 1998. See Affidavit of Jeffrey Stillwell in Support of Defendants' Motion for Summary Judgment ("Stillwell Aff."), ¶ 1. As the Director of Banquet Services, Stillwell's duties include, among other things, overseeing the execution of all of the events held at Pier Sixty, and supervising all of Pier Sixty's Banquet Servers who run the events. Id. Stillwell reports to Doug Giordano, Pier Sixty's General Manager. Id.

6. Defendant James Kirsch is a managing member of AK Pier Sixty, LLC, which in turn is a member of defendant Pier Sixty, LLC. See Affidavit of James Kirsch in Support of Defendants' Motion for Summary Judgment ("Kirsch Aff."), ¶ 1. Kirsch is not in any way involved in the day-to-day administration of Pier Sixty's business, and maintains no control over

its operations. See Giordano Aff. ¶ 4; Kirsch Aff. ¶ 2; Kaplan Decl. Ex. B, 205:14-206:11. Rather, on a monthly basis, Giordano meets with Kirsch and the other owners of Pier Sixty to provide them with an update as to Pier Sixty's operations. See Giordano Aff. ¶ 4; Kirsch Aff. ¶ 2.

7.  Outside of these monthly meetings, Kirsch only speaks with Giordano occasionally and usually solely for the purpose of receiving additional updates. See Kirsch Aff. ¶ 3. On some occasions, if asked, Kirsch will provide his opinion on how to handle various minor issues that may come up from time to time (e.g., how to handle an event cancelled on account of a snowstorm). Id. Ultimately, however, all of the decisions are left up to Giordano. Id.

8.  Kirsch has no interactions with any of Pier Sixty's servers. See Kirsch Aff. ¶ 4. Kirsch does not ever: (1) hire or fire any of the servers; (2) supervise and/or control the work schedules or conditions of employment of the servers; (3) determine the rate and/or method of compensation for the servers; or (4) maintain any employment records for the servers. See Kirsch Aff. ¶ 4. All of these functions are handled by Pier Sixty's General Manager, Doug Giordano, and the rest of his staff. Id. Giordano and Kirsch do not discuss any issues relating to the servers. See Kirsch Aff. ¶ 3.

**Cost of Events at Pier Sixty**

9.  Clients who book events at Pier Sixty all pay a negotiated "price per person" charge, plus a mandatory 22% service charge (based on the total food and beverage costs of the event) and the applicable New York state sales tax (unless the client can provide documentation that it is a tax-exempt organization). See Giordano Aff. ¶ 5.

10. The service charge payment is an additional charge used to cover personnel, administrative, and other costs associated with running the event. See Giordano Aff. ¶ 5.

11. The mandatory service charge is not unique to Pier Sixty, as virtually all of its competitors imposed a similar charge for their events. See Giordano Aff. ¶ 5. Pier Sixty's competitors, like Pier Sixty, do not provide their service staff with the entire service charge payments collected; they will either provide their service staff with only a portion of the service charge payment proceeds or none at all. Id.

12. The amount of the service charge has increased twice since Giordano was hired at Pier Sixty. See Giordano Aff. ¶ 6. When he was hired, the service charge was 20% of the food and beverage costs. Id. After being hired as General Manager, Giordano decided to increase the service charge to 21%, and then again later to 22%. Id.

**Compensation Structure for Pier Sixty's Servers**

13. Pier Sixty has always classified its servers as "exempt" employees pursuant to the retail or service establishment exemption of the federal Fair Labor Standards Act and, thus, has never been required to provide the overtime compensation required by that statute to its servers. See Giordano Aff. ¶ 7.

14. The servers' compensation consists of their standard hourly rate, their "add pay," plus their individual payout from the service charge. See Giordano Aff. ¶ 7. The servers' standard hourly rate is $3.75 per hour for the first 40 hours worked. Id. The servers then receive "add pay" in the amount of $5.63 per hour (1.5 times the hourly rate of $3.75) for all hours worked in excess of 40 hours per week, when applicable. Id. The "add pay" is an additional form of compensation offered by Pier Sixty on a voluntary basis in recognition of its servers' dedication and hard work. Id.

15. In addition to receiving their base pay and any add pay, Pier Sixty's servers receive a percentage of the service charge collected from the client hosting each event that the

servers worked. See Giordano Aff. ¶ 8. The 22% service charge (i.e., an additional 22% of the total food and beverage cost) for each event is distributed by Pier Sixty as follows: 12.25% (or approximately 55% of the service charge) is allocated for the banquet servers' compensation, and 9.75% (or approximately 45% of the service charge) is used to cover additional personnel, administrative and other costs. Id. The servers' compensation portion of the service charge is distributed amongst the servers based on a formula implemented by Pier Sixty which takes into account both the servers' position (i.e., "captain," "server" or "bartender") and their number of hours worked. Id.; Giordano Aff. Ex. B.

16. Plaintiffs have conceded that the service charge is merely intended to "include" their alleged gratuity, and is used to cover "everything else" that is associated with running the event. See Kaplan Decl. Ex. C, 103:4-18; Kaplan Decl. Ex. G, 92:9-14.

17. In any given month, more than half of the servers' compensation is always derived from the payout they receive from the service charges collected. See Giordano Aff. ¶ 9; Kaplan Decl. Ex. E, 151:23-152:2. In fact, their service charge payouts generally represent over 75% of the servers' monthly compensation. See Giordano Aff. ¶ 9; Kaplan Decl. Ex. D, 140:15-24.

18. With their service charge payouts, the servers' hourly compensation typically ranges between $23-$26 per hour. See Giordano Aff. ¶ 10. However, Pier Sixty's full-time and part-time servers are all guaranteed to receive a minimum hourly rate of $20 per hour and $19 per hour, respectively, for each event worked. Id. If their total compensation rate based on the factors listed above exceeds the guaranteed minimum, the server receives the former; in the rare instances where their total compensation rate for an event falls below the guaranteed minimum, the server receives the latter. Id. Thus, the servers' regular rate of pay is always at least $20 per

hour for full-time servers and $19 per hour for part-time servers. Id. Pier Sixty has maintained the $19 hourly minimum for its servers, dating back to 2000. Id.

19. Plaintiffs concede they have never been paid less than this guaranteed hourly minimum. See Kaplan Decl. Ex. C, 140:22-25; Kaplan Decl. Ex. B, 169:5-11.

20. The compensation structure has essentially remained the same over the years; the primary changes implemented have been the applicable percentages involved. See Giordano Aff. ¶ 11. For example, as noted above, in previous years, the service charge was only 20% of the food and beverage cost of the event -- with 12.5% of the food and beverage cost being paid out to the servers, and 7.5% used by Pier Sixty to pay for the other labor and administrative costs associated with running the event. See Giordano Aff. ¶ 11; Ex. A. Now, however, Pier Sixty charges a 22% service charge – with 12.25%[1] being paid out to the servers and 9.75% used by Pier Sixty to pay for the other labor and administrative costs associated with running the event. See Giordano Aff. ¶ 11; Ex. B.

21. Kirsch has never personally accepted or demanded any portion of the service charge which is included in the cost of all of the events at Pier Sixty. See Kirsch Aff. ¶ 5.

22. Pier Sixty's servers were never told that they would receive 100% of the service charge collected from their events. See Giordano Aff. ¶ 8; Kaplan Decl. Ex. A, 145:16-19; Kaplan Decl. Ex. C, 102:8-12; Kaplan Decl. Ex. D, 160:21-161:8; Kaplan Decl. Ex. E, 109:11-17.

---

[1] While the servers' percentage is lower than in previous years, their total compensation is actual higher because, unlike previous years, the Banquet Managers no longer share in the portion of the service charge payouts designated for the service staff; they receive a separate portion of the service charge collected for each event. Giordano Aff., ¶ 11, n.1.

**Event-Booking Process At Pier Sixty**

23. When a prospective client contacts Pier Sixty to inquire about hosting an event there, Pier Sixty will assign one of its Sales Managers to discuss the client's objectives and preferences for the event, provide the client with a description of the facility and all of its offerings, and outline the potential costs. See Giordano Aff. ¶ 12.

24. If the client is interested in hosting their event at Pier Sixty, the assigned Sales Manager will explain the cost of the event as outlined for the client which, as noted above, always includes the mandatory 22% service charge. See Giordano Aff. ¶ 13. Most of Pier Sixty's events are booked at least several months in advance of the actual event date. See Barsky Aff. ¶ 9.

25. While Pier Sixty typically works directly with the client in booking an event, some of Pier Sixty's clients retain a professional event planner to help them with their respective events. See Barsky Aff. ¶ 3. In those circumstances, the Pier Sixty Sales Manager will work directly with the client's event planner. Id. Since the event planners are experienced and knowledgeable about the nature of our charges, Pier Sixty rarely, if ever, has to provide them with an explanation of what their charges represent. Id.

26. After the parties have negotiated the total cost of the event, Pier Sixty will provide the client with a contract to be signed for the event, which provides a breakdown of these costs. See Giordano Aff. ¶ 14; Barsky Aff. ¶ 2. The Sales Manager will typically be the individual who will answer any questions the client has regarding the contract. See Barsky Aff. ¶ 2.

27. Once the contract is signed, Pier Sixty will then work with the client to prepare a Banquet Event Order ("BEO") form which lists all of the details of the event – e.g., the food and beverage selections, the event schedule, the floor plan for the event space, etc. See Giordano

Aff. ¶ 14. The BEO form references the fact that all charges will be subject to a service charge as well. Id. The BEO form is signed by the client after completion. Id.

28. The Pier Sixty representative who handles client inquiries concerning the event after the contract is signed varies depending on the type of event being held. See Giordano Aff. ¶ 15. For corporate and fundraising events, the Sales Manager will continue to work with the client in planning in the event up until the day of the event, at which point the assigned Banquet Manager will assume responsibility for running the actual event; for social events, the Banquet Manager assigned to run the event will begin working with the client soon after the contract is signed. Id.

29. The Plaintiffs have no role in the booking process described above or in the pricing of Pier Sixty's events. See Kaplan Decl. Ex. A, 107:12-14; Kaplan Decl. Ex. B, 106:21-107:7; 107:14-16; Kaplan Decl. Ex. C, 90:2-8; Kaplan Decl. Ex. D, 70:6-9; 70:24-71:2, Kaplan Decl. Ex. E, 98:14-16; 98:20-25; Kaplan Decl. Ex. F, 117:25-118:4; 118:17-19; Kaplan Decl. Ex. G, 89:22-90:6.

30. The Plaintiffs do not engage in any communications with Pier Sixty's clients leading up to the date of the event. See Kaplan Decl. Ex. A, 108:16-19; Kaplan Decl. Ex. B, 107:4-7; Kaplan Decl. Ex. D, 70:10-23; Kaplan Decl. Ex. E, 98:17-19; Kaplan Decl. Ex. F, 118:5-7; Kaplan Decl. Ex. G, 90:7-10.

31. The Plaintiffs have never seen any of Pier Sixty's client contracts. See Kaplan Decl. Ex. A, 70:11-17; Kaplan Decl. Ex. D, 72:7-9; Kaplan Decl. Ex. E, 99:2-4; Kaplan Decl. Ex. F, 118:13-16; Kaplan Decl. Ex G, 90:20-23.

**Pier Sixty's Clients' Expectations Regarding The Service Charge**

32.     Pier Sixty's clients do not believe Pier Sixty's service charge is a charge being imposed as a gratuity, or as a payment in lieu of a gratuity, for the event's servers. See Kaplan Decl. Ex. H, ¶ 3; see also Kaplan Decl. Ex. K, ¶¶ 3, 11.  Rather, Pier Sixty's clients understand that Pier Sixty servers, unlike those servers who work in a restaurant setting, are paid all of their applicable wages from Pier Sixty, and do not work for tips or gratuities. See Kaplan Decl. Ex. H, ¶ 3; Kaplan Decl. Ex. J, ¶ 4.

33.     Pier Sixty's Sales Managers have never represented to Pier Sixty's clients, or otherwise led them to believe, that the entire 22% service charge is being paid as a gratuity, or as a payment in lieu of a gratuity, for the servers. See Barsky Aff. ¶ 4; Kaplan Decl. Ex. I, ¶ 5; see also Kaplan Decl. Ex. J, ¶ 6; Kaplan Decl. Ex. K, ¶ 10.

34.     Pier Sixty rarely receives any inquiries regarding what the service charge covers. See Barsky Aff. ¶ 5; Kaplan Decl. Ex. H, ¶ 2; Kaplan Decl. Ex. I, ¶ 4.

35.      When asked, Pier Sixty's Sales Managers explain that a <u>portion</u> of the service charge is paid to the servers as part of their compensation, and/or that the service charge <u>includes</u> compensation for our servers -- all of which is, and has always been, completely accurate. See Barsky Aff. ¶ 5; see also Kaplan Decl. Ex. J, ¶ 4.

36.     Pier Sixty's clients have never expressed any interest in ensuring that the servers (or any other employees) receive any specific amount of compensation for working at their events. See Barsky Aff. ¶ 6; Kaplan Decl. Ex. I, ¶ 6.  In this regard, Pier Sixty's Sales Managers never get asked what portion of the service charge is being paid to the servers or how much the servers are earning for working the event. See Barsky Aff. ¶ 6; see also Kaplan Decl. Ex. J, ¶ 4.

37. Rather, Pier Sixty's clients only express concern about their bottom-line cost for their respective events. See Barsky Aff. ¶ 6; see also Kaplan Decl. Ex. H, ¶ 2; Kaplan Decl. Ex. I, ¶ 4; Kaplan Decl. Ex. K, ¶ 6.

38. When Pier Sixty's clients make inquiries regarding what is covered by the charges listed in the event contract, they are only interested in learning whether they are required or expected to provide any additional compensation for the staff above and beyond the contract price. See Barsky Aff. ¶ 6.

39. The Plaintiffs admittedly have no knowledge regarding how Pier Sixty describes the service charge to its clients. See Kaplan Decl. Ex. B, 109:3-13; Kaplan Decl. Ex. G, 97:16-19.

40. The Plaintiffs admittedly have no knowledge regarding Pier Sixty's clients' expectations regarding what the service charge represents, what it is intended to cover, or how it is distributed. See Kaplan Decl. Ex. A, 134:25-135:10; Kaplan Decl. Ex. B, 116:14-22; Kaplan Decl. Ex. D, 72:3-6; 77:24-78:4; Kaplan Decl. Ex. E, 111:16-21; Kaplan Decl. Ex. F, 128:7-10; Kaplan Decl. Ex. G, 94:16-21.

**Pier Sixty's Description Of The Mandatory Service Charge In Its Contracts**

41. Prior to April 2008, the section in Pier Sixty's standard contract entitled "Service Charge" read as follows:

> ***22% of food and beverage sales will be added to your bill.***

See Giordano Aff. ¶¶ 16-17; Ex. C. Pier Sixty imposed a sales tax on this service charge. See Giordano Aff. ¶ 16.

42. Relying upon its knowledge and understanding of the law, Pier Sixty operated under the working assumption that this service charge could not be deemed a "gratuity" under

New York state law because, unlike gratuities, it was a mandatory charge imposed on its clients for each event. See Giordano Aff. ¶ 16. Pier Sixty further operated under the working assumption that it was not required to account for its clients' "expectations" with respect to the distribution of the service charge, or to provide the full amount of the service charge to its servers in the absence of doing so. Id.

43. As evidence of its good faith attempt to comply with the law at all times, Pier Sixty kept various materials on file which it received from the New York State Restaurants Association and other similar sources and which indicated that a mandatory service charge was not considered a "gratuity" under New York law. See Giordano Aff. ¶ 16; Ex. D.

44. The New York Court of Appeals issued its 2008 decision in Samiento v. World Yacht, Inc., in which it held that a mandatory service charge imposed by companies in the hospitality industry may now be deemed a gratuity under New York state law if the facility led a "reasonable customer" to believe that the service charge was meant to serve as a gratuity for its servers. See 10 N.Y.3d 70 (2008).

45. In response to the World Yacht decision and in an abundance of caution, Pier Sixty amended its contract language regarding the service charge to explicitly disclose which portion of the 22% service charge was being paid to the severs as part of their compensation, and which portion of the service charge was being used to cover other expenses associated with the event. See Giordano Aff. ¶ 17.

46. In this regard, commencing in or around April 2008, Pier Sixty changed its service charge provision to read as follows:

> ***12.25% of the food and beverage cost will be added to your account as a gratuity. This amount is fully distributed to servers, captains, and/or bartenders that are assigned to and work your event. 9.75% of the food and beverage cost (which is subject to all applicable sales taxes) will be***

> *added to your account as a service charge. This is not a gratuity and serves to offset ancillary expenses associated with the event.*

See Giordano Aff. ¶ 17; Ex. E.

47. This language did not reflect any change in company policy regarding the distribution of the service charge; it merely reflected what was already being done (i.e., that the servers received 12.25% of the food and beverage costs as part of their compensation). See Giordano Aff. ¶ 17. However, upon making this change in the contract language, Pier Sixty did cease charging sales tax on the portion of the service charge allocated for the servers, captains and/or bartenders, while still charging sales tax on the remaining portion of the service charge used to cover the event's ancillary expenses. See Barsky, Aff. ¶ 7.

48. After it made this modification to its contract language and its tax treatment of the service charge, Pier Sixty received a lot of questions from its clients regarding the differentiation in tax treatment between the two charges. See Barsky, Aff. ¶ 7. Even though these changes ended up saving the client money (because they were now being charged sales tax on only a portion of the service charge), they ended up causing significant confusion for Pier Sixty's clients. Id. None of the resulting client confusion, however, revolved around what portion of the service charge was being paid to our servers. Id.

49. Thus, commencing in or around August 2008, Pier Sixty amended its contract language regarding the "service charge" a second time, to read as follows:

> *All food and beverage items are subject to a 22% service charge. The service charge is not a gratuity and is used to cover personnel, administrative or other costs. An 8.375% New York state sales tax applies to all charges.*

See Giordano Aff. ¶ 19; Ex. F. Pier Sixty has continued to utilize this language in its contracts ever since. See Giordano Aff. ¶ 19.

**Staffing at Pier Sixty Events**

50. Stillwell assigns a Banquet Manager to run each individual event. See Stillwell Aff. ¶ 2. At times, Stillwell will personally handle the Banquet Manager duties for numerous events himself throughout the year. Id.

51. Stillwell also assigns several Captains for each event, who in turn report to the Banquet Manager assigned for that event. See Stillwell Aff. ¶ 2. Each Captain is in charge of overseeing one or more particular aspects of the service for the event (e.g., floor service captain, bar captain, coat check captain, kitchen captain, etc.). Id.

52. Pier Sixty will also assign any number of its approximately 200 full-time, part-time, and "on-call" servers to provide the actual bar and food service at each event. See Stillwell Aff. ¶ 3.

**Pier Sixty's No-Tipping Policy For Guests**

53. Pier Sixty has always maintained a policy that its servers are not permitted to accept tips from the guests attending the events. See Giordano Aff. ¶ 20. Pier Sixty has also traditionally posted a sign by the coat-check area advising the guests of the event that tipping is not permitted. Id.

54. Pier Sixty maintains such a policy and posts such signs in order to advise the client's guests that they shall not be required, expected or permitted to pay any monies to Pier Sixty's service staff when they attend the event, since all of the costs of the parties – including the staff's compensation – has been covered by Pier Sixty and the host of the party (i.e., Pier Sixty's client). See Giordano Aff. ¶ 21.

**Cash Gratuities From Pier Sixty's Customers Who Host The Events**

55. Unlike the guests at the event, the host of the event (i.e. Pier Sixty's client), is always free to provide the servers (or any other Pier Sixty staff member) with an additional gratuity if it so chooses. See Stillwell Aff. ¶ 4.

56. In this regard, some Pier Sixty clients will inquire about whether it is required or expected of them to pay any type of gratuities on top of their contracted fees at the end of the event. See Barsky Aff. ¶ 8. In response to these inquiries, Pier Sixty will typically advise its clients that no gratuities are required or expected, but that they are free to provide one if they so choose, and that the Banquet Manager is the only individual who typically receives any kind of gratuity. Id.

57. Pier Sixty has also historically sent each client who held a social event at Pier Sixty (e.g., weddings, bar-mitzvahs, etc.) a letter before the event advising the client that gratuities for the Banquet Managers may be provided, but solely at their discretion. See Barsky Aff. ¶ 8.

58. Some Pier Sixty clients do in fact provide a cash gratuity to one or more members of the Pier Sixty staff, usually the Banquet Manager, at the conclusion of the event. See Stillwell Aff. ¶ 4. Cash gratuities are paid at the sole discretion of the client, and are not paid by all of Pier Sixty's clients. Id.

59. These additional cash gratuities are often provided to the Banquet Manager in envelopes at the end of the event, although there are occasions where a client will request that the gratuity simply be added to their final invoice. See Stillwell Aff. ¶ 5.

60. A client will occasionally provide instructions with respect to how their gratuity is to be distributed amongst the Pier Sixty staff members. See Stillwell Aff. ¶ 6. When this occurs, the Banquet Manager is expected to, and does in fact, comply with such instructions. Id.

61. There has not been a single occasion since Pier Sixty opened in 1998 where a Banquet Manager failed to comply with a client's instructions regarding the distribution of a cash gratuity. See Stillwell Aff. ¶ 6.

62. Pier Sixty's clients will rarely make a specific request that a certain portion of their cash gratuity be distributed to the servers; however, when this occurs, the Banquet Manager who received such a cash gratuity has always shared the cash gratuity with the servers in accord with the client's instructions. See Stillwell Aff. ¶ 6; see also Kaplan Decl. Ex. I, ¶ 8; Kaplan Decl. Ex. K, ¶¶ 9, 12.

63. Plaintiffs have admitted that they did in fact receive a cash gratuity from the Banquet Managers for each of the events where they had first-hand, personal knowledge that the host had provided a cash gratuity for them. See Kaplan Decl. Ex. A, 124:16-127:2; Kaplan Decl. Ex. D, 124:7-125:24; Kaplan Decl. Ex. F, 201:4-202:12.

64. On most occasions when a cash gratuity is provided, however, the client simply provides the gratuity to the Banquet Manager without any specific instructions. See Stillwell Aff. ¶ 5. Those cash gratuities are intended solely for the Banquet Manager, and are made in recognition of the extraordinary service provided by the Banquet Manager at the actual event. Kaplan Decl. Ex. I, ¶ 7. Nevertheless, the Banquet Managers will generally pool their gratuity money together at the end of the week, and "tip out" any specific individuals who they believe deserve special recognition for their efforts that week. See Stillwell Aff. ¶ 7.

65. There is no specific policy requiring Banquet Managers to share their cash gratuities with the servers or other staff members or, if they elect to do so, the manner in which they do it. See Stillwell Aff. ¶ 7. Unless the client provides them with instructions as to how the cash gratuity should be divided, the Banquet Managers are free to decide what portion of their cash gratuities, if any, will be shared with their fellow staff members, and with whom, at their sole discretion. Id.

**Effect Of Judgment Against Pier Sixty**

66. Any judgment requiring Pier Sixty to pay its servers the unpaid portion of all the service charges collected from every Pier Sixty event dating back to November 2002 would result in a multi-million damage award, and would place the continued viability of Pier Sixty in doubt. See Kirsch Aff. ¶ 6.

Dated: March 5, 2010    */s/ Carolyn Diane Richmond*

FOX ROTHSCHILD LLP
Carolyn D. Richmond, Esq.
Seth M. Kaplan, Esq.
100 Park Avenue, Suite 1500
New York, New York 10017
*Attorneys for Defendants*
*Pier Sixty, LLC, and James Kirsch*