UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x
CELESTE SPICER, AUTUMN BURGESS, AMY LEDIN, :
JOSEPH RUSSO, ESTHER MARTINEZ, LYSETTE :
ROMAN, and SERENA SIYING HUI, on behalf of :
themselves and others similarly situated, :
 : 08 Civ. 10240 (LBS)
      Plaintiffs, :
 : ECF CASE
 :
   - v. - :
 :
 :
PIER SIXTY, LLC and JAMES KIRSCH, :
 :
      Defendants. :
---------------------------------------------------------------------- x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'<br>MOTION FOR RECUSAL


> FRIED, FRANK, HARRIS, SHRIVER &
>  JACOBSON LLP
> Douglas H. Flaum, Esq.
> Lisa H. Bebchick, Esq.
> One New York Plaza
> New York, New York 10004
> Telephone:  (212) 859-8000
> Facsimile:  (212) 859-4000
>
> FOX ROTHSCHILD LLP
> Carolyn D. Richmond, Esq.
> Seth M.  Kaplan, Esq.
> 100 Park Avenue, Suite 1500
> New York, New York 10017
> Telephone:  (212) 878-7900
> Facsimile:  (212) 692-0940
>
> *Counsel for Defendants*
> *Pier Sixty, LLC and James Kirsch*

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT .............................................................................................................. 10

I.      RECUSAL IS REQUIRED UNDER 28 U.S.C. § 455(a) AND *UNITED STATES V. LILJEBERG* IN LIGHT OF THE COURT'S LONG-STANDING, CLOSE PERSONAL RELATIONSHIP WITH BOB AND HELEN BERNSTEIN ......................................................................................... 10

      A.     If A Reasonable Person, Knowing All The Facts Concerning The Potentially Disqualifying Circumstances, Could Reasonably Question The Court's Impartiality, Recusal Is Required Under Section 455(a) ................................................................ 10

      B.     The Court's Relationship with Bob and Helen Bernstein, Whose Children Have Substantial Financial Interests In This Significant Litigation, Requires Recusal ...................................... 12

II.     IN THE ABSENCE OF FULL DISCLOSURE CONCERNING THE DISQUALIFYING CIRCUMSTANCES, THERE CAN BE NO WAIVER OF A CLEAR DISQUALIFYING CONFLICT .................................................. 16

CONCLUSION .......................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*,
  343 F.3d 120 (2d Cir. 2003)...................................................................................11, 15, 16

*In re Int'l Business Machines Corp.*,
  45 F.3d 641 (2d Cir. 1995)...........................................................................................11

*Liljeberg v. Health Services Acquisition Corp.*,
  486 U.S. 847 (1988)............................................................................................ *passim*

*Pashaian v. Eccelston Properties, Ltd.*,
  88 F.3d 77 (2d Cir. 1996) ............................................................................................12

*United States v. Amico*,
  486 F.3d 764 (2d Cir. 2007)..........................................................................10, 11, 15

*United States v. Kelly*,
  888 F.2d 732 (11th Cir. 1989) .....................................................................................13

*United States v. Murphy*,
  768 F.2d 1518 (7th Cir. 1985) .....................................................................................13

*United States v. Tucker*,
  78 F.3d 1313 (8th Cir. 1996) .......................................................................................13

## STATUTES

28 U.S.C. § 455..................................................................................................... *passim*

## OTHER AUTHORITIES

32 Am. Jur. 2d *Federal Courts* § 69 (2010)...............................................................2, 13

123 Harv. L. Rev. 120 (2009) ...........................................................................................12

ABA Model Code of Judicial Conduct Canon 1 (2007). .......................................10

ABA Model Code of Judicial Conduct R. 2.4 (2007).........................................2, 13

Defendants Pier Sixty, LLC ("Pier Sixty") and James Kirsch (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to 28 U.S.C. § 455(a), for the Court's recusal from this case.

## PRELIMINARY STATEMENT

The goal of 28 U.S.C. § 455(a), which disqualifies a federal judge from acting in a proceeding in which his or her impartiality "'might reasonably be questioned,'" is "'to avoid even the appearance of partiality.'"  *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859-860 (1988) (citation omitted).  The test under § 455(a) is an objective one, focusing not on what the judge actually knew but rather on what the public might reasonably believe he or she knew.  *Id.* at 860-61.  This objective, rather than subjective, test advances the very purpose of the recusal statute, namely "to promote public confidence in the judicial process."  *Id.* (citing H.R. REP. NO. 93-419, p. 5 (1974)).  As the Supreme Court emphasized in *Liljeberg*:

> If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created *even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible*.

*Id.* (emphasis added) (quotations and citations omitted).  Thus, "recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge."  *Id.* at 860-61.

Surely not all relationships, or even friendships, that a judge has mandate recusal under § 455(a).  Rather, it is a matter of degree.  Thus, the lynchpin of any recusal analysis is how close the judge's relationship is with the party with an interest in the outcome of the case.  While a casual or past friendship may not be of a degree sufficient to cause an ordinary person to

question a judge's impartiality, certainly a long-standing, very close, personal friendship would. *See* 32 AM. JUR. 2D *Federal Courts* § 69 (2010) ("recusal is required when the level of a personal relationship increases to the point that … a reasonable person would question the judge's impartiality"); *see also* ABA MODEL CODE OF JUDICIAL CONDUCT R. 2.4 & R. 2.4 cmt. 1 (2007). The Court's admittedly "very close" friendship with Robert ("Bob") and Helen Bernstein is the quintessential type of relationship that mandates recusal under § 455(a) in light of the fact that the Bernsteins' son, Tom, derives 100% of his earned income from the business of Chelsea Piers, L.P. ("Chelsea Piers"), which has its largest business holding – a 70% ownership interest – in Defendant Pier Sixty, and the Bernsteins' other two sons have significant financial interests in Chelsea Piers as well.

Professor Stephen Gillers, the Crystal Eastman Professor of Law at New York University School of Law, who has been retained by Defendants to advise on and analyze the ethical issues here, has submitted his declaration explaining his opinion that in this case:   "[R]ecusal is *required*.  Indeed, given the potential consequences of an adverse decision here to the Bernstein children and the interests of the parents, coupled with the close friendship between the Sands and the Bernsteins, *this conclusion is inescapable*."  Declaration of Stephen Gillers, dated April 12, 2011 (hereinafter "Gillers Decl."), at ¶ 20 (emphasis added).  There can be no question that the Court's relationship with Bob and Helen Bernstein – who the Court in March described as "among my closest and dearest friends" – would cause a reasonable person to question the Court's impartiality, even if the Court was, in fact, impartial.

As the Court is aware, this is a case where Plaintiffs seek tens of millions of dollars in damages, including millions in claimed liquidated damages based on Defendants' alleged willful conduct, which Defendants vigorously dispute.  A judgment at or even approximating the scope

of Plaintiffs' demands for relief against Pier Sixty would have a devastating effect on Chelsea

Piers and on the financial and business interests of Tom Bernstein, as well as his brothers'

investment in Chelsea Piers.   The mere existence of this case has caused Bob and Helen

Bernstein serious discomfort about participating in and maintaining the friendship that they hold

dear with the Court and Mrs. Sand.   The relationship between the Court and Bob and Helen

Bernstein is precisely the type of relationship that requires the Court's disqualification under

§ 455(a) and *Liljeberg*, and as Professor Gillers explained:

> *This is not a hard case* … Judge Sand has said that he "regard[s]
> the Bernsteins as being very close dear friends" and "among my
> closest and dearest friends."  This friendship spans more than 25
> years.  Judge Sand cannot sit in a case that may spell great
> financial harm to one of the Bernsteins' three sons and have a
> materially adverse effect on the company he co-founded, as well as
> cause substantial injury to the financial interests of their two other
> sons, who are also invested in the company through the trust that
> the Bernsteins have created for them.

Gillers Decl. at ¶ 30 (emphasis added).  Defendants' motion should be granted.

## STATEMENT OF FACTS

**Bob and Helen Bernstein.**  For more than twenty years, the Court and Mrs. Sand have

been very close personal friends of Bob and Helen Bernstein, whose three sons, Tom, William

("Bill"), and Peter Bernstein, each have a significant financial interest in the outcome of this

litigation.  *See* Declaration of Robert L. Bernstein, dated April 12, 2011 (hereinafter, "RB

Decl."), at ¶¶ 2-3; Declaration of Helen Bernstein, dated April 12, 2011 (hereinafter, "HB

Decl."), at ¶¶ 2-3; Declaration of Tom A. Bernstein, dated April 12, 2011 (hereinafter, "TB

Decl."), at ¶ 16.  Plaintiffs in this case are seeking tens of millions of dollars in damages,

including more than several millions of dollars in liquidated damages for alleged willful conduct,

which allegations Defendants wholeheartedly dispute.

Tom Bernstein is the President and one of the principals and co-founders of Chelsea

Piers, which owns a 70% interest in Defendant Pier Sixty, one of the two named defendants in this lawsuit. *See* TB Decl. at ¶ 1. Chelsea Piers is the business from which Tom Bernstein derives 100% of his earned income. *Id.* at ¶ 16. In addition, as described in greater detail below, Bob and Helen Bernstein's other two sons, Bill and Peter, also have a substantial interest in Chelsea Piers. *See* RB Decl. at ¶ 2; HB Decl. at ¶ 2; TB Decl. at ¶ 13. Thus, this litigation could have a significant financial impact on each of Bob and Helen's three children, but most notably Tom. *See* RB Decl. at ¶ 17; HB Decl. at ¶ 18; TB Decl. at ¶ 16.

**The Court's Disclosure on June 15, 2010.**  At some point after the Court was assigned to this case in the fall of 2008, Tom Bernstein told his parents, Bob and Helen, that their "old friend" was presiding over a case in which he was involved. *See* RB Decl. at ¶ 12; TB Decl. at ¶ 4. While Bob and Helen thought that it was somewhat strange that the Court would handle the case, they never discussed with Tom how close their relationship was with the Court and Mrs. Sand, and thus Tom continued to understand the Court and Mrs. Sand to be old friends of his parents that they saw on occasion. *See* RB Decl. at ¶¶ 12, 14; HB Decl. at ¶ 15; TB Decl. at ¶¶ 4, 9.

Prior to the oral argument on Defendants' motion for summary judgment in this case, Tom Bernstein discussed with Fox Rothschild LLP ("Fox Rothschild"), Pier Sixty's counsel, that his parents were old friends of the Court and Mrs. Sand. *See* TB Decl. at ¶ 5. Fox Rothschild told Tom that it had consulted with its general counsel, and that it was up to the Court to determine whether recusal was necessary based on that relationship. *Id.* On June 15, 2010, in the robing room before oral argument on Defendants' motion for summary judgment, the Court stated as follows:

> Reading over these papers *I have been giving some thought to my personal contacts I have had, none of which I think are grounds*

*for disqualification*, but I thought that the prudent thing to do would be just to discuss them with you.

What I don't know, and I don't think I want to know unless you think it's relevant, is the relationship between the defendants and Chelsea Piers. I have been in Chelsea Piers on three occasions, in the Lighthouse I think once. The first occasion I was in the Chelsea Piers my wife gave, and I don't remember whether it was a 95th birthday or a 100th birthday to my mother-in-law.  It was a great event.  My mother-in-law died at 103 and was a great golfer and for either her 95th or 100th birthday we had all the guests in the golf range and my mother-in-law went up and down in a wheelchair criticizing as she went.

…

Thereafter I think when Lighthouse opened, I am not sure what the event was, but people who had previously been clients in an event at Chelsea Piers were invited to a dinner.  And they went to that. The third occasion was about 2 or 3 weeks ago.  *I am a friend and neighbor in the same general community in northern Westchester of Robert Bernstein, who is the father of Tom Bernstein.*  Tom Bernstein is one of the owners of Chelsea Piers and he gave *a cocktail party* for his girlfriend, to introduce us to his girlfriend, and *we were there as friends of the Bernsteins. End of story*.

*I don't think any of that is [] grounds for anything* but I didn't want at some point late in this proceeding someone saying Judge Sand didn't say anything.

6/15/10 Tr. at 2:1-25 – 3:1-6 (emphasis added) (attached as Exhibit A to the Declaration of Lisa

H. Bebchick, dated April 13, 2011 (hereinafter, "Bebchick Decl.")).

Tom Bernstein was not in attendance at the oral argument on June 15, 2010, and did not

receive a copy of the transcript of the oral argument until after Fried, Frank, Harris, Shriver &

Jacobson LLP ("Fried Frank") became involved in this case in August 2010.  *See* TB Decl. at

¶¶ 6-7.  After the oral argument on June 15, Fox Rothschild gave Defendants an oral report,

which focused mostly on the substance of the argument portion of the summary judgment

motion, although Fox Rothschild did report briefly that the Court did not believe that its

relationship with Bob and Helen Bernstein was a disqualifying one, and the Court had also

disclosed that it had attended some events at Chelsea Piers and that Plaintiffs' counsel had not objected to the Court's participation. *Id.* at ¶ 6.[1]

Tom had no reason to question the Court's June 15 description of the relationship between the Court and Mrs. Sand and his parents, because it was consistent with his understanding of the relationship at the time. *Id.* at ¶ 7.[2]  Indeed, the Court's description fits with Tom's personal experience since Tom, who is close to his parents, recalls meeting the Court and Mrs. Sand only a couple of times over the past twenty years, and the only time he can specifically recall was at his brother Bill's engagement party at Chelsea Piers in the spring of 2010, which was the event disclosed by the Court on June 15, 2010. *Id.* at ¶¶ 7, 9.  At that event, Tom recalls perhaps shaking the Court's hand and briefly greeting Mrs. Sand, who was also in attendance, along with approximately one hundred other guests. *Id.* at ¶ 9.

***New Facts Learned After the February 11, 2011 Conversation Between Helen Bernstein and Tom Bernstein.***  On February 11, 2011, Helen Bernstein and Tom Bernstein had a telephone conversation, during which Helen told Tom that she and Bob were scheduled to have dinner with the Court and Mrs. Sand at Bob and Helen's home in Bedford, New York the following evening, Saturday, February 12, 2011.  *See* HB Decl. at ¶ 13; TB Decl. at ¶ 8.  Helen told Tom that Mrs. Sand had been calling her to plan a dinner date, but that she and Bob felt uncomfortable having dinner with the Court and Mrs. Sand because of this litigation.  *See* HB Decl. at ¶ 13; TB Decl. at ¶ 8.  She told Tom that while she and Bob felt awkward about having

---

[1]    Fox Rothschild also mentioned the Court's description of an engagement party that the Court and Mrs. Sand had attended for Bill Bernstein, Tom's brother, which was described by the Court as a party for Tom's "girlfriend."  *See* TB Decl. at ¶ 6.  Tom recalls focusing on this statement at the time because he has been married for over twenty years to his wife, Andrea ("Andi").  *See id.*

[2]    Plaintiffs stated at the March 16, 2011 conference requested by Defendants that at the initial scheduling conference in this case, the Court "mentioned [its] relationship with Mr. Bernstein and discussed with the parties whether they thought that would be a problem."  3/16/11 Tr. at 6:9-11 (Bebchick Decl., Exh. B).  No transcript of that conference exists, and in any event, as discussed herein, Tom Bernstein (and thus Defendants' counsel) had no reason to question the Court's description of the relationship at that time.

dinner with the Court and Mrs. Sand in light of the pending case, they decided to go ahead with the February 12 dinner because they did not want to offend or upset their friends by declining the dinner invitation.  *See* RB Decl. at ¶ 13; HB Decl. at ¶ 13; TB Decl. at ¶ 8.

Tom Bernstein was surprised to learn from his mother about the dinner scheduled for February 12, 2011.  *See* TB Decl. at ¶ 9.  Following the February 11 telephone conversation, Tom immediately contacted Fried Frank to tell them about what he had learned.  *Id.* at ¶ 10. Fried Frank told Tom that Bob and Helen should cancel the dinner if they felt uncomfortable in light of the litigation, and Tom subsequently contacted his parents and, as Bob and Helen felt "very uncomfortable" about the entire situation, discussed with them how best to tell the Court and Mrs. Sand that they would be unable to have dinner with them.  *See* RB Decl. at ¶ 13; HB Decl. at ¶ 14; TB Decl. at ¶ 10.  Helen then called Mrs. Sand to say that she and Bob unfortunately could not keep the dinner date because the Court was presiding in a case involving Tom, as well as her two other sons, Bill and Peter, but that they hoped to be able to have dinner another time.  *See* HB Decl. at ¶ 14.

It was not until after the telephone conversation on February 11, 2011 that Bob or Helen told Tom about the extent of their relationship with the Court and Mrs. Sand.  *See* RB Decl. at ¶ 14; HB Decl. at ¶ 15; TB Decl. at ¶ 12.  Indeed, that conversation was the precipitating event that led Tom to learn for the first time new facts concerning his parents' relationship with the Court and Mrs. Sand, including the following:[3]

- Bob and Helen consider the Court and Mrs. Sand to be "very close friends."  TB Decl. at ¶ 12;

- Before Bob and Helen moved to Bedford, New York in approximately 1984, they

---

[3]     The declarations of Bob and Helen Bernstein accompanying this motion contain further detail, which Tom learned in the days following the February 11 conversation with his mother, about the relationship with the Court and Mrs. Sand, and Defendants direct the Court to those declarations for that additional detail.

saw and interacted with the Court and Mrs. Sand only occasionally and mostly at events.  However, after they moved to Bedford in 1984, Bob and Helen played doubles tennis with the Court and Mrs. Sand "on most weekends" (although they have since stopped playing due to health reasons), either at an indoor tennis facility during the colder months, or, during the warmer months, at a tennis court at Bob and Helen's home.  *Id.*;

- Bob and Helen "frequently" have dinner with the Court and Mrs. Sand on a Friday or Saturday night, usually in Bedford.  *Id.*;

- Bob and Helen and the Court and Mrs. Sand attend dinner parties, cookouts, and cocktail parties at each others' homes in Bedford quite frequently.  *Id.*;

- The Court and Mrs. Sand spent New Year's Eve with Bob and Helen at a small party that Bob and Helen hosted for a number of years.  Although Bob and Helen have stopped hosting the party, the Court and Mrs. Sand continue to spend New Year's Eve with Bob and Helen as part of a small group of friends who go to the movies together (with the exception of this past year due to some illnesses in the group).  *Id.*;

- Helen and Mrs. Sand are "close friends" and speak regularly on the telephone.  *Id.*;

- Helen recommended the Court and Mrs. Sand's son, David, for a position on the Board of Directors of the Enterprise Foundation, a non-governmental organization that works on the issue of affordable housing.  *Id.*; and

- David Sand, and perhaps certain of the Court and Mrs. Sand's other children, stayed in Bob and Helen's cottage at their home in Bedford over Thanksgiving

holidays when he was home visiting the Court and Mrs. Sand.  *Id.*

In addition, while Tom had previously known that his parents had invested $1,000,000 in Chelsea Piers when the entity was formed in 1994 and later gave that interest to his brothers, Bill and Peter, he did not know until he learned from the family accountant on or about February 28, 2011, that Bill and Peter received such interests in Chelsea Piers as beneficiaries of a trust established by Bob and Helen in 1999 named the "Robert and Helen Bernstein 1999 Trust" (the "Trust").  *See* TB Decl. at ¶ 13.  Specifically, Bob and Helen invested $1,000,000 in Chelsea Piers when it was formed in 1994; however, in 1999, they gifted such interest to the Trust for the benefit of Bill and Peter, as beneficiaries, and appointed Tom, Bill, and Peter as trustees.  *See* RB Decl. at ¶ 2.  The Trust is a defective grantor trust, which means that the Trust's assets will not be included in Bob or Helen's estate; however, Bob and Helen are responsible for including the Trust's income on their income tax returns and paying the tax on the income generated by the Trust.  *Id.*

**The Court's Recent Disclosure on March 16, 2011.**  On March 16, 2011, the Court held a conference, which had been requested by Defendants to bring to the Court's attention the new facts learned following the February 11, 2011 conversation between Tom and Helen Bernstein. At that conference, Defendants' counsel told the Court that Tom Bernstein and the Trust are major shareholders in Chelsea Piers, which owns 70% of Pier Sixty, one of the two named defendants in this case, and that this is a very significant case for Tom, in particular, as his entire livelihood is implicated.  *See* 3/16/11 Tr. at 3:24-25 – 4:1-6 (Bebchick Decl., Exh. B).  In response, the Court stated, "I did not know that and I did not know that until this moment."  *Id.* at

-9-

4:8-9.[4]

With respect to its relationship with Bob and Helen Bernstein, the Court stated: "I regard the Bernsteins as being very close dear friends. No question about that," (3/16/11 Tr. at 4:21-22), and the Bernsteins are "people I regard as among my closest and dearest friends." *Id.* at 9:9-10. The Court concluded the March 16 conference by stating that it was going to recuse itself from this case. *See id.* at 11:10-11.[5]

## ARGUMENT

I. **RECUSAL IS REQUIRED UNDER 28 U.S.C. § 455(a) AND *UNITED STATES V. LILJEBERG* IN LIGHT OF THE COURT'S LONG-STANDING, CLOSE PERSONAL RELATIONSHIP WITH BOB AND HELEN BERNSTEIN**

A. **If A Reasonable Person, Knowing All The Facts Concerning The Potentially Disqualifying Circumstances, Could Reasonably Question The Court's Impartiality, Recusal Is Required Under Section 455(a)**

Impartiality is the foundation of an independent judiciary, and that basic principal is embodied within the very first Cannon of the American Bar Association Code of Judicial Conduct, which provides that "[a] judge shall uphold and promote the independence, integrity, and impartiality of the judiciary." ABA MODEL CODE OF JUDICIAL CONDUCT Canon 1 (2007). Through the enactment of the federal recusal statute, 28 U.S.C. § 455(a), Congress made plain the importance of protecting not only the right to a fair and impartial judiciary, but also the appearance of impartiality. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988) ("We must continuously bear in mind that 'to perform its high function in the best way justice must satisfy the appearance of justice.'") (citations omitted); *see also United States v.*

---

[4]    At the June 15 hearing, the Court also stated that it did not know about the relationship between Defendants and Chelsea Piers. *See* 6/15/10 Tr. at 2:7-9 (Bebchick Decl., Exh. A) ("What I don't know, and I don't think I want to know unless you think it's relevant, is the relationship between the defendants and Chelsea Piers.").

[5]    The next day, March 17, 2011, this case was assigned to the Honorable Richard M. Berman. *See* 3/17/11 Notice of Reassignment. Plaintiffs' counsel, however, requested that Defendants be required to file a formal recusal motion, which request was granted by the Court. As a result, this case was reassigned to the Court on March 21, 2011, pending resolution of the instant motion. *See* 3/21/11 Notice of Reassignment.

*Amico*, 486 F.3d 764, 775 (2d Cir. 2007) ("[Section 455(a)]'s purpose is the protection of the public's confidence in the impartiality of the judiciary.").

Section 455(a) provides that "[a]ny justice, judge or magistrate [magistrate judge] of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a) (emphasis added).  Thus, rather than create a subjective test based on a presiding judge's actual bias or impartiality – or what the judge actually knew or did not know about potentially disqualifying circumstances – § 455(a) creates an objective test requiring recusal to prevent even the appearance of partiality.  *See Liljeberg*, 486 U.S. at 859-60; Gillers Decl. at ¶ 19.  In analyzing whether a particular set of facts mandates recusal under § 455(a), the question that a court should ask is "[w]ould a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned?"  *Amico*, 486 F.3d at 775 (citation omitted); *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2d Cir. 2003) ("The determination of whether such an appearance has been created is an objective one based on what a reasonable person knowing all the facts would conclude.") (citing *Liljeberg*, 486 U.S. at 860-861).

Since "[t]he goal of section 455(a) is to avoid even the appearance of partiality,"  recusal under § 455(a) is "*required* even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge."  *Liljeberg*, 486 U.S. at 860-61 (emphasis added) (internal citation omitted); *see also Affiliated FM Ins. Co.*, 343 F.3d at 127 ("Actual partiality" is not required under § 455(a), which "governs circumstances that constitute an appearance of partiality") (citing *Liljeberg*, 486 U.S. at 860); *In re Int'l Business Machines Corp.*, 45 F.3d 641, 644 (2d Cir. 1995) (concluding on mandamus that recusal was required where it was "clear that a

-11-

reasonable observer would question the Judge's impartiality" notwithstanding that the Court was "prepared to assume that the Judge's subjective disposition is one of impartiality").

As emphasized by Professor Stephen Gillers, it does not matter whether a court is biased for or against the moving party because courts recognize the concept of "compensatory bias," where the concern is that the public might perceive (even though not actually the case) that a court is "bend[ing] over backwards to avoid any appearance of partiality, thereby inadvertently favoring the opposing party." Gillers Decl. at ¶ 22 (internal quotations omitted); *see also Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 81-83 (2d Cir. 1996) (a party may seek recusal "even if the alleged bias would be in the moving party's favor" because of the "possibility of [a] compensatory bias by an interested judge"); 123 Harv. L. Rev. 120, 139 n.134 (2009) ("So-called 'compensatory bias' is also recognized as a basis for judicial disqualification under 28 U.S.C. § 455(a)," and has been interpreted "to support disqualification of a judge who is biased in favor of a party, on motion filed by the favored party, under the theory that the judge may actually overcompensate and inadvertently favor the other side."). This is so whether or not the Court has *actually* inadvertently favored the other side because an objective party with knowledge of the facts of the relationship might believe that the judge may overcompensate and inadvertently favor the other side. *See* Gillers Decl. at ¶¶ 16, 22. In fact, § 455(a) still requires recusal even if the Court was not aware of the disqualifying circumstances or facts that would require recusal under the statute in the first instance. *Liljeberg*, 486 U.S. at 859 ("Scienter is not an element of a violation of § 455(a)."); Gillers Decl. at ¶ 25.

**B.** **The Court's Relationship with Bob and Helen Bernstein, Whose Children Have Substantial Financial Interests In This Significant Litigation, Requires Recusal**

A very close personal relationship, which has lasted for over twenty years, between the presiding judge and the parents of individuals who could be significantly impacted by the

-12-

outcome of a litigation, is precisely the type of circumstance that would lead a court's impartiality to reasonably be called into question.  *See* Gillers Decl. at ¶ 30.[6]  The Court's obligation to maintain impartiality means that judges must decide cases free from "external influences," including "the judge's friends or family," because "[c]onfidence in the judiciary is eroded if judicial decision making is perceived to be subject to inappropriate outside influences." ABA MODEL CODE OF JUDICIAL CONDUCT R. 2.4 & R. 2.4 cmt. 1 (2007).  Thus, "recusal is required when the level of a personal relationship increases to the point that a judge cannot be impartial, or a reasonable person would question the judge's impartiality."  32 AM. JUR. 2D *Federal Courts* § 69 (2010).[7]  The degree of closeness of the personal relationship is thus the critical factor in determining whether recusal is required under Section 455(a).  *See id.*; Gillers Decl. at ¶ 30.

As Professor Gillers has emphasized, disqualification is plainly required in this case under § 455(a) – and it is not even a close question – due to the long-standing nature and close degree of the personal relationship between the Court and Mrs. Sand and Bob and Helen Bernstein.  *See* Gillers Decl. at ¶ 30.  By the Court's own description at the March 16 conference, which was confirmed by Bob and Helen Bernstein, the Bernsteins and the Sands are the "closest and dearest [of] friends."  3/16/11 Tr. at 9:9-10 (Bebchick Decl., Exh. B); *see* RB Decl. at ¶ 16

---

[6]      *See* Gillers Decl. at ¶¶ 27-29 (discussing *United States v. Kelly*, 888 F.2d 732, 738, 745 (11th Cir. 1989) (holding that recusal was required where judge's wife was a close personal friend of the wife of a witness for the defendant in a bench trial); *United States v. Murphy*, 768 F.2d 1518, 1538 (7th Cir. 1985) (holding that a close social relationship between judge and prosecutor created a situation where "an objective observer reasonably would doubt the ability of a judge to act with utter disinterest and aloofness"); *United States v. Tucker*, 78 F.3d 1313, 1325 (8th Cir. 1996) (holding that judge's friendship with President and Mrs. Clinton, who publicly supported defendant after his indictment, required recusal)).

[7]      In light of the nature of the very close, personal relationship that the Court has with Bob and Helen Bernstein, whose children have significant financial interests in the outcome of this litigation, the objective test set forth in § 455(a) is easily met, as a reasonable person knowing the facts of the relationship would conclude that the judge may not be impartial.  *See* Gillers Decl. at ¶¶ 20, 30.  In this case, however, even a subjective test would be met given the Court's statement at the March 16, 2011 conference: "I am going to recuse myself because I think that if I don't recuse myself, my resentment about the motion being made and being made at this time *may be something which would impact on my ability to be a disinterested judge in this case*."  3/16/11 Tr. at 10:1-5 (emphasis added).

("I would agree with Judge Sand's more recent statement that we are 'very close dear friends' and that he counts us as among his 'closest and dearest friends.'"); HB Decl. at ¶ 17 ("I would agree with Judge Sand's more recent statement that he considers Bob and me as his 'very close dear friends' and that we are among his 'closest and dearest friends,'" which "is certainly how we feel about the Judge and Ann.").  Not only has this personal relationship created an "incredibly awkward and uncomfortable" situation for the parties to the relationship (RB Decl. at ¶ 17),[8] but it is plainly of the type that would cause a reasonable person to question the Court's partiality.  *See* Gillers Decl. at ¶¶ 20, 30.  Indeed, even Plaintiffs' counsel has recognized that the new facts raised by Defendants concerning the relationship put the Court in a "position in which his impartiality is questioned."  3/16/11 Tr. at 10:24-25.

Recusal is required under § 455(a) in light of the fact that Bob and Helen Bernstein's son, Tom (as well as the Bernsteins' other two sons), has a substantial financial interest in the outcome of this significant litigation, which undoubtedly creates the appearance of partiality.  *See* Gillers Decl. at ¶¶ 20, 30-31.  The Supreme Court's decision in *Liljeberg* is directly on point.  In *Liljeberg*, the Supreme Court held that disqualification was required under § 455(a) due to the trial judge's relationship with a university's board of trustees, which had a significant financial interest in the outcome of the litigation, even though – as is the case here with respect to the relationship between Chelsea Piers and Defendant Pier Sixty – the trial judge "did not have actual knowledge" of the disqualifying circumstances.  486 U.S. at 864-67.  The Supreme Court

---

[8]       The fact that this Court is presiding over this litigation has created an awkward and uncomfortable dynamic for the parties to the relationship, which should not exist.  Individuals who have a close, personal relationship with a presiding judge, such as the Bernsteins, should not have to evaluate ordinary decisions that they make in the course of their friendship with a judge, such as whether to keep a dinner date or return a phone call, because they think – even if it is not actually the case – that they may aggravate or disappoint the judge in some way.  *See* RB Decl. at ¶ 17 ("It has become incredibly awkward and uncomfortable for us, as we have to scrutinize once ordinary choices that we make in the course of our friendship, such as whether to keep a dinner date or return a phone call."); HB Decl. at ¶ 18 ("It is incredibly uncomfortable for us to have continued contact with Judge and Ann Sand in light of the fact that the case pending before Judge Sand could have a devastating financial impact on all of my children, most notably Tom, whose livelihood is at stake.").

reasoned that Congress chose "not to require knowledge" under Section 455(a), and that "advancement of the purpose of the provision – to promote public confidence in the integrity of the judicial process – does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety". *Id.* at 859-60 (citation omitted).

While the Supreme Court recognized that "[w]hen a busy federal judge concentrates his or her full attention on a pending case, personal concerns are easily forgotten," the problem remains that "people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." *Id.* at 864-65.  For that reason, as the Supreme Court emphasized in *Liljeberg*, a district court's lack of knowledge of the disqualifying circumstance simply "cannot overcome the objective appearance of a conflict of interest requiring disqualification under Section 455(a)." *Affiliated FM Ins. Co.*, 343 F.3d at 129-30 (holding that recusal was required under § 455(a) where the trial judge was not only unaware that he held a security interest in a large publicly-traded litigant, but also "had no real financial stake in the outcome").[9]

Thus, it does not matter that, as the Court stated at the March 16, 2011 conference, it did not know about the relationship between non-party Chelsea Piers and Defendant Pier Sixty until that moment.  *See* 3/16/11 Tr. at 4:8-9 (Bebchick Decl., Exh. B).  As stated above, the Supreme Court has made clear that recusal may be required whether or not the Court had actual knowledge of its disqualifying interest, as the relevant inquiry under § 455(a) is the appearance

---

[9]     Congress "eliminate[d] a judge's 'duty to sit' in very close cases by adding the 'might reasonably be questioned' standard of § 455(a)." *Amico*, 486 F.3d at 775 n.3 (quoting H.R. REP. NO. 93-1453 (1974)).  In light of the long-standing relationship that exists here between the Court and Mrs. Sand and Bob and Helen Bernstein, this is simply not one of those close cases.  *See* Gillers Decl. at ¶ 30.  While it, of course, is unfortunate that the case has progressed through discovery before the facts concerning the relationship were fully understood; the reality is, although it should have no bearing on the question of whether recusal is required here under § 455(a), that there has been no trial or final judgment and the factual record and number of decisions rendered is not enormous by any measure.  Thus, the case for recusal here is more compelling than in *Liljeberg*, where the disqualification occurred post-trial.  *See also Amico*, 486 F.3d at 775 ("the absence of a final judgment before the motion was filed, leans in the [movant]'s favor").

of partiality, and not the existence of actual bias. *See Liljeberg*, 486 U.S. at 864. For purposes of recusal under § 455(a), whether the Court knew that Chelsea Piers holds a 70% interest in Defendant Pier Sixty, or whether it knew that Tom Bernstein's livelihood is at stake in this case, is simply not relevant. *See* Gillers Decl. at ¶ 25; *Liljeberg*, 486 U.S. at 859 ("Scienter is not an element of a violation of § 455(a).").

## II.    IN THE ABSENCE OF FULL DISCLOSURE CONCERNING THE DISQUALIFYING CIRCUMSTANCES, THERE CAN BE NO WAIVER OF A CLEAR DISQUALIFYING CONFLICT

Only "after 'a full disclosure on the record of the basis for disqualification'" may a court accept a party's waiver of a disqualifying conflict under § 455(a). *See Liljeberg*, 486 U.S. at 860 n.8 (quoting 28 U.S.C. § 455(e)) ("[w]here the ground for disqualification arises only under sub-section (a), waiver may be accepted *provided it is preceded by a full disclosure on the record of the basis for disqualification*") (emphasis added); *see also Affiliated FM Ins. Co.*, 343 F.3d at 127 ("the parties may, *if fully informed*, waive grounds for disqualification under Section § 455(a)") (emphasis added). Because full disclosure of the nature and extent of the Court's relationship with Bob and Helen Bernstein did not occur here until the March 16 conference, there can be no finding that either party waived this plainly disqualifying circumstance. *See* Gillers Decl. at ¶ 20.[10]

Indeed, a review of the transcripts from the June 15, 2010 and March 16, 2011 proceedings, and a comparison of the statements made at each concerning the nature and extent of the relationship between the Court and Mrs. Sand and Bob and Helen Bernstein, makes clear

---

[10]    While Defendants understand in theory the Court's stated concerns at the June 15 hearing that the Court "didn't want at some point late in this proceeding someone saying Judge Sand didn't say anything" (6/15/10 Tr. at 3:5-6), and that a party may use a recusal motion as "just a pretext for getting a substitution for a judge who they feel might be adverse on the merits" (3/16/11 Tr. at 9:2-3), Defendants in this case simply did not know the full extent or nature of the Court's relationship with Bob and Helen Bernstein. Moreover, Defendants had no choice but to raise this now, as failure to clarify the record here could result in enormous prejudice if the Court were to preside over a trial in this case to verdict.

that the full nature and extent of the relationship was not fully and completely disclosed until the conference held on March 16, 2011.  *See* Gillers Decl. at ¶¶ 20-21.  During the more recent conference, the Court stated quite clearly that it regarded Bob and Helen as "very close dear friends" (3/16/11 Tr. at 4:21-22) and "as among my closest and dearest friends."  *Id.* at 9:9-10.  These statements are materially different from the Court's earlier disclosures concerning the relationship, namely that Bob Bernstein is a "friend and neighbor in the same general community in northern Westchester of Robert Bernstein, who is the father of Tom Bernstein" (6/15/10 Tr. at 2:23-25), and that the Court and Mrs. Sand have attended "*a* cocktail party … as friends of the Bernsteins."  *Id.* at 3:1-3 (emphasis added).[11]  After reviewing and comparing both transcripts, Professor Gillers came to the same conclusion:

> *Here, there was not "full disclosure on the record" until March of this year.*
>
> …
>
> The Court's reference to the Sand-Bernstein friendship at the June 15, 2010 oral argument *did not reveal the closeness of the friendship*.  By contrast, the Court's description of that friendship at the March 26, 2011 hearing did so.  *It was only then that the facts warranting the application of § 455(a) were first put on the record*.

Gillers Decl. at ¶¶ 20-21 (emphasis added).

While aware that his parents, Bob and Helen, were old friends with the Court and that his parents would see the Court and Mrs. Sand on occasion, Tom Bernstein was not aware, and consequently, neither was Defendants' counsel, at the time of the June 15, 2010 disclosure that the relationship was of the close, personal degree that it is.  The statement that the Court is "a

---

[11]      Indeed, Bob and Helen Bernstein were surprised to recently learn about the Court's June 15 statements concerning the relationship.  *See* HB Decl. at ¶ 17 ("I was surprised to learn recently that Judge Sand recently described Bob and me as merely 'friends and neighbors in the same general community,' and that he had attended a single event with us at Chelsea Piers."); RB Decl. at ¶ 16 ("I believe that our relationship with Judge and Ann Sand was, and is, stronger and closer than that.").  Moreover, at the June 15 hearing, the Court did not specifically mention the fact that Helen Bernstein and Mrs. Sand are "close friends."  *See* HB Decl. at ¶ 9.

friend and neighbor in the same general community" of Bob Bernstein and that the Court attended one cocktail party "as friends of the Bernsteins," was not inconsistent with what Tom, and concomitantly Defendants' counsel who was present at the June 15 hearing, understood the relationship to be at the time, which could reasonably be viewed as closer to an old or casual relationship. As Professor Gillers explained:

> *The reason for the lack of an earlier disclosure (or motion for recusal) is readily apparent and understandable.* Tom Bernstein knew that the result in this matter could cause profound financial harm to non-party Chelsea Piers, L.P., his company. But he did not know about the closeness of the friendship between the Sands and his parents. Meanwhile, Judge Sand did know of the close friendship, but he did not know the extent to which the result in this matter could financially harm Tom Bernstein and his brothers.

Gillers Decl. at ¶ 21 (emphasis added). It was not until the March 16 conference that the critical facts became known, and the disqualifying conflict could not have been waived by any party to the litigation before that date. *See id.* at ¶¶ 20-21.

For the reasons set forth above, like the district judge's fiduciary interest in *Liljeberg*, the Court's over twenty-year close personal relationship with Bob and Helen Bernstein, whose children have a substantial financial interest in the outcome of this litigation (and who themselves have a parental and donative interest in the case) requires disqualification from this case. *See id.* at ¶¶ 20, 30. Accordingly, the Court should grant Defendants' motion for recusal.

-18-

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the Court should grant

Defendants' motion for recusal pursuant to 28 U.S.C. § 455(a).


**FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP**


By:        /s/ Douglas H. Flaum
         Douglas H. Flaum, Esq.
         Lisa H. Bebchick, Esq.

One New York Plaza
New York, New York 10004
Telephone:  212-859-8000
douglas.flaum@friedfrank.com
lisa.bebchick@friedfrank.com

FOX ROTHSCHILD LLP
Carolyn D. Richmond, Esq.
Seth M.  Kaplan, Esq.
100 Park Avenue, Suite 1500
New York, New York 10017
Telephone:  212-878-7900

*Counsel for Defendants*
*Pier Sixty, LLC and James Kirsch*

8056362

-19-