UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x
CELESTE SPICER, AUTUMN BURGESS, AMY LEDIN,   :
JOSEPH RUSSO, ESTHER MARTINEZ, LYSETTE       :
ROMAN, and SERENA SIYING HUI, on behalf of   :
themselves and others similarly situated,    :
                                              :
                             Plaintiffs,   :   08 Civ. 10240 (LBS)
                                              :
                                              :   ECF CASE
              - v. -                :
                                              :
                                              :
PIER SIXTY, LLC and JAMES KIRSCH,            :
                                              :
                        Defendants.   :
---------------------------------------------------------------------- x


# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DECERTIFY THE CLASS


FRIED, FRANK, HARRIS, SHRIVER &
   JACOBSON LLP
Douglas H. Flaum, Esq.
Lisa H. Bebchick, Esq.
One New York Plaza
New York, New York 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

FOX ROTHSCHILD LLP
Carolyn D. Richmond, Esq.
Eli Z. Freedberg, Esq.
100 Park Avenue, Suite 1500
New York, New York 10017
Phone:  (212) 878-7900

*Counsel for Defendants Pier Sixty, LLC and James Kirsch*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

FACTUAL BACKGROUND........................................................................................................ 5

ARGUMENT ................................................................................................................................ 8

    I.   THE RIGOROUS ANALYSIS REQUIRED BY *DUKES* MANDATES
        DECERTIFICATION OF THE CLASS IN THIS CASE .................................................. 9

    II.  PLAINTIFFS CANNOT DEMONSTRATE COMMONALITY,
        ESPECIALLY WHERE THEY RELY ON INDIVIDUAL EMAIL
        COMMUNICATIONS .................................................................................................... 13

    III. PLAINTIFFS LACK TYPICALITY, WHICH REQUIRES DECERTIFICATION ........ 16

    IV. NUMEROSITY IS ALSO LACKING FOR THE OVERWHELMING
        MAJORITY OF EVENTS IN THE CLASS PERIOD ..................................................... 18

CONCLUSION............................................................................................................................ 19

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050,
    2011 WL 2682967 (N.D. Cal. July 8, 2011)......................................................................9, 10

*FPX, LLC v. Google, Inc.*, No. 2:09-CV-142-TJW-CE,
    --- F.R.D. ----, 2011 WL 4783376 (E.D. Tex. Sept. 29, 2011)..............................................10

*Gen. Telephone Co. of Southwest v. Falcon*,
    457 U.S. 147 (1982)....................................................................................................................9

*Haynes v. Planet Automall, Inc.*, 09-CV-03880,
    2011 U.S. Dist. LEXIS 89640 (E.D.N.Y. Aug. 12, 2011)......................................................10

*In re Salomon Smith Barney Mutual Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)....................................................................................18

*In re Taco Bell Wage & Hour Actions*, No. 1:07–cv–01314,
    2011 WL 4479730 (E.D. Cal. Sept. 26, 2011)........................................................................11

*In re Wachovia Equity Securities Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................................................................................18

*Krebs v. Canyon Club, Inc.*,
    880 N.Y.S.2d 873, 2009 WL 440903
    (N.Y. Sup. Ct. Westchester County Jan. 2, 2009) ..................................................................10

*Lin v. Benihana Nat'l Corp.*,
    275 F.R.D 165 (S.D.N.Y. 2011) ............................................................................................19

*Nenni v. Dean Witter Reynolds, Inc.*, No. 98-12454-REK,
    1999 WL 34801540 (D. Mass. Sept. 29, 1999) ....................................................................18

*Red v. Kraft Foods, Inc.*, No. CV 10–1028–GW(AGRx),
    2011 WL 4599833 (C.D. Cal. Sept. 29, 2011) ......................................................................10

*Rodriguez v. Nat'l City Bank*, No. 08-2059,
    --- F. Supp. 2d ----, 2011 WL 4018028 (E.D. Pa. Sept. 8, 2011) .......................................9, 10

*Samiento v. World Yacht*,
    10 N.Y.3d 70 (2008) ...................................................................................................... = *passim*

*Shahriar v. Smith & Wollensky Restaurant Group*, No. 10-1884-cv,
    --- F.3d ----, 2011 WL 4436284 (2d Cir. Sept. 26, 2011).....................................................12

## <u>TABLE OF AUTHORITIES (Cont.)</u>

Page(s)

*Sumitomo v. Credit Lyonnaise Rouse*,
   262 F.3d 134 (2d Cir. 2001)..................................................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)................................................................................ *passim*

*Watts v. Jackson Hewitt Serv., Inc.*,
   579 F. Supp. 2d 335 (E.D.N.Y. 2008) ................................................................13

*Wilner v. Allstate Ins. Co.*,
   71 A.D.3d 155 (1st Dep't 2010) .........................................................................13

### <u>RULES</u>

Fed. R. Civ. P. 23 ....................................................................................... *passim*

### <u>OTHER AUTHORITIES</u>

John C. Coffee Jr., U.S. Supreme Court and Securities Litigation; Corporate Update,
   N.Y.L.J. (Online) (July 21, 2011) ..........................................................................1

Russell Jackson, *Wal-Mart v. Dukes Opinion Will Have Far-Reaching Application
   in Class Action Defense*, Jackson on Consumer Class Actions and Mass Torts: A
   Newstex Web Blog (June 20, 2011, 4:34 PM EST) ................................................1

Joseph Ostoyich, et al., "Landmark Supreme Court *Wal-Mart* Decision Expands
   Defense Against Class Certification," June 27, 2011 ...............................................1

Defendants Pier Sixty LLC ("Pier Sixty") and James Kirsch respectfully submit this Memorandum of Law in support of their motion to decertify the Plaintiff class with respect to the New York Labor Law ("NYLL") claims.[1]

## PRELIMINARY STATEMENT

Earlier this year, well after class certification was granted in this case, the United States Supreme Court decided its most significant case involving class certification in a generation, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). Commentators immediately recognized that *Dukes* had "breathed a new life into the previously hollow 'commonality' requirement of [Fed. R. Civ. P.] 23(a)" and was "likely to have far-reaching effects on federal class actions."[2] Indeed one commentator noted that "[m]any courts had pretty much read commonality out of the Rule 23(a) analysis, concluding that if any common questions existed, the commonality standard was met. No more."[3]

In *Dukes*, the plaintiffs argued that Wal-Mart's local managers exercised their discretion over pay and promotions disproportionately in favor of men, which had a disproportionate impact on female employees. While the district court certified a class and the Ninth Circuit affirmed, the Supreme Court reversed, holding that it was not permissible to lump together the employment practices of 3,400 separate Wal-Mart locations into a single class, because of a fatal lack of commonality. In doing so, the Supreme Court stated, among other things, that Rule 23(a)(2) requires a party seeking class certification to prove that the class has common

---

[1]     Defendants do not seek by this motion to decertify the opt-in collective action with respect to the federal statutory claims.

[2]     *See* John C. Coffee Jr., U.S. Supreme Court and Securities Litigation; Corporate Update, N.Y.L.J. (Online) (July 21, 2011), at 4; Joseph Ostoyich, et al., "Landmark Supreme Court *Wal-Mart* Decision Expands Defense Against Class Certification," June 27, 2011, *available at* http://www.lexology.com/library/detail.aspx?g=a7109d11-a2ce-4505-8cb9-c969c8c6fc17.

[3]     *See* Russell Jackson, "*Wal-Mart v. Dukes* Opinion Will Have Far-Reaching Application in Class Action Defense," Jackson on Consumer Class Actions and Mass Torts: A Newstex Web Blog (June 20, 2011, 4:34 PM EST), at 2.

"questions of law or fact," that are "central" to the adjudication of the action:

> 'What matters to class certification . . . is not the raising of common "questions" – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'

131 S. Ct. at 2551 (citation omitted) (emphasis in original). Put another way, plaintiffs' claims "must depend upon a common contention of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is *central* to the validity of each one of the claims *in one stroke*." *Id.* at 2545.[4]

The Supreme Court emphasized that Rule 23 "does not set forth a mere pleading standard." 131 S. Ct. at 2551. Rather, "a party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original). Thus, district courts ruling on class certification must engage in "rigorous analysis" – including of the underlying merits – to see whether the burden of proving class certification has been satisfied, because "actual, not presumed, conformance with Rule 23(a) remains indispensable." *Id.* (internal citations and quotation marks omitted). In sum, and as directly relevant here, the Supreme Court forbids the use of a class action to create a class based on facial similarities (*i.e.*, the fact that Pier Sixty used form contracts to charge and collect mandatory service charges from its customers), where there are critical differences that will control the specific merits of a claim.

The instant case raises unique issues and challenges in applying *Dukes*. The core question in *Dukes* for purposes of class certification was the reason for the particular decision made by Wal-Mart's local managers. The Supreme Court found wholly absent the "significant proof" necessary to show that Wal-Mart "operated under a general policy of discrimination,'"

---

[4]    Unless otherwise indicated, emphasis is added throughout.

which proof was required to bridge the "conceptual gap between an individual's discrimination claim and the existence of a class of persons who have suffered the same injury." *Id.* at 2553, 2545 (internal citation and quotation marks omitted). Here, the crucial question for purposes of determining whether class certification is appropriate is not whether a mandatory service charge was charged, collected, and distributed in a certain way, as those facts are undisputed. Rather, the critical legal and factual inquiry in order to establish commonality is whether the "reasonable patron" booking an event (*i.e.*, an individual not a party to this action) would have believed that 100% of the mandatory service charge constituted a gratuity that would be given in its entirety to the servers. This "reasonable patron" standard was announced for the first time by the New York Court of Appeals in *Samiento v. World Yacht*, 10 N.Y.3d 70 (2008), which notably itself was not a class action and therefore contains no discussion of the propriety of class certification of claims based on its "reasonable patron" standard or the practical application of Rule 23's class certification requirements.

This case presents a paradox. Plaintiffs are claiming a windfall of tens of millions of dollars, seeking the portion of the service charge that was not already paid to them in accordance with Pier Sixty's compensation formula. However, Plaintiffs were admittedly not misled about their compensation or with respect to what portion of the mandatory service charge they were to receive. As set forth in the motion for partial summary judgment filed contemporaneously herewith, it is undisputed that, at all relevant times:

- Pier Sixty *always* charged, collected, and paid New York State sales tax on the full amount of the mandatory service charge, which tax would not have been charged on gratuities;

- Pier Sixty *always* paid its servers (the Plaintiffs in this action) a highly-competitive wage (typically $23 to $26 per hour, with a guarantee of $19 and $20 per hour);

- Pier Sixty *always* included a mandatory service charge of between 21% and

22% in its customer contracts, and paid *more than half* to its servers; and

- Plaintiffs *always* understood precisely how they were being compensated and how much of the mandatory service charge was being remitted to them as compensation.[5]

In other words, what Plaintiffs have in common as a class is that they knew how they were compensated and were not misled in that regard.  Critically, the individuals who were purportedly misled by Pier Sixty – its thousands of customers planning and hosting the approximately 4,000 different types of banquet events at issue in this case, including corporate, philanthropic, and social events – are *not* the members of the certified class.  Indeed, they could not be since, following extensive discovery in this case, Plaintiffs have not identified *even a single customer* over the entire eight year period to testify he or she was misled in any way.  This underscores that the common experience of Pier Sixty's customers was not one where they were misled, let alone deliberately misled like World Yacht's customers.[6]

Far from being able to be resolved in simply "one stroke," as the Court previously acknowledged in its class certification/summary judgment order (the "July 27 Order"), an event-by-event analysis is required to determine what the reasonable customer booking the event would believe.[7]  It is also necessary to conduct an inquiry at the customer level – the purportedly misled party – utilizing an objective test, which takes into account the level of sophistication of the customer, the type of event being held (corporate, philanthropic, or social milestone event),

---

[5]      *See, e.g.*, Declaration of Douglas H. Flaum in Support of Defendants' Motion to Decertify the Class, dated November 9, 2011 ("Flaum Declaration"), Ex. 1 (8/12/09 Spicer Dep. 110:18-21) ("Q: Okay.  Did anyone at Pier Sixty ever tell you that 100 percent of the service charge gets distributed to the servers? A: No, that was never said to us."); Flaum Decl., Ex. 2 (11/11/09 Burgess Dep. 102:8-12) ("Q:  Did anyone from Pier Sixty ever communicate to you that the servers would be entitled to the full amount of the 22 percent service charge?  A: I don't think so."); Flaum Decl., Ex. 3 (8/6/09 Russo Dep. 145:16-19) ("Q: But at no time did anyone at Pier Sixty tell you that you would get 100 percent of the service charge, did they? A: No.").  Unless otherwise indicated herein, all references to "Ex." are to the exhibits attached to the Flaum Declaration.

[6]      The defendants in World Yacht allegedly deliberately told their customers that the service charge went to the waitstaff despite the fact that they converted the entire amount for their own use, paid none of it to the waitstaff, and failed to charge or collect sales tax.

[7]      *See* Ex. 4 (Memorandum & Order, dated July 27, 2010, at 25-26).

the customer's prior knowledge and experience, and whether the customer used an event planner.

Plaintiffs, on the one hand, argue that these differences among customers – ranging from professional event planners organizing their 30th event at Pier Sixty to a father planning his child's bar mitzvah – are irrelevant because the *World Yacht* standard is a purely objective test, relying on an inapposite case in the criminal procedure context. But, on the other hand, Plaintiffs (and the Court previously in the July 27 Order) rely upon unique email communications – relating only to approximately 1-2% of the thousands of events at issue – between individual Pier Sixty sales managers and individual customers (or their event planners) as part of their proof that Pier Sixty led its customers to believe that the service charge would be given to the servers in its entirety. Plaintiffs' reliance on these emails is particularly inappropriate because almost 40% of the emails cited by Plaintiffs and relied upon by the Court in the July 27 Order relate to events that were never actually booked and thus cannot be the basis for any claim by any class member.

Even assuming these emails did, in fact, support Plaintiffs' claim – they do not – this scant and event-specific proof simply cannot be applied to all of the different events in this case to establish commonality of the claim that all customers were misled and thus understood the mandatory service charge to be a tip. Certainly what one customer was told over email by one sales manager cannot be sufficient to establish what every different customer was told and understood, and certainly cannot fairly be extrapolated so as to establish liability across approximately 4,000 events. This was the precise holding of *Wal-Mart*.

## **FACTUAL BACKGROUND**

**Pier Sixty.** Pier Sixty is a joint venture between AK Pier Sixty, LLC, part of a family-owned catering business managed by Defendant James Kirsch, and Chelsea Piers, L.P., which has three principals who are long-time business partners, Tom Bernstein, Roland Betts, and David Tewksbury. *See* Ex. 5 (11/24/09 Kirsch Dep. 27:23-28:7, 88:9-10); Ex. 6 (3/30/11 Kirsch

Dep. 8:5-7, 17:10-14).   These closely-held entities have worked tirelessly to build from the ground up one of the premiere banquet facilities in New York City.   *See* Ex. 7 (3/3/10 Giordano Aff. ¶ 2).

Pier Sixty operates two event spaces, Pier Sixty and The Lighthouse, both of which are located within the Chelsea Piers sports and entertainment complex in New York City.   *See id.* Pier Sixty's customers are the persons planning and hosting the events, not the guests attending the events.   *See* Ex. 7 (3/3/10 Giordano Aff. ¶ 12); Ex. 8 (5/17/10 Giordano Reply Aff. ¶ 3).   Pier Sixty's customers host different types of events at its banquet facilities, including corporate, philanthropic, and social milestone events (such as weddings and bar or bat mitzvahs).   *See* Ex. 8 (5/17/10 Giordano Reply Aff. ¶ 3).   Many of Pier Sixty's customers use the services of a professional event planner or have previously hosted events at Pier Sixty's facilities.[8]   Pier Sixty's customers testified that a service charge was never understood to be a gratuity that would be provided to the servers.[9]

**Pier Sixty's Servers.**   The class certified for the NYLL claims includes essentially all banquet servers employed by Pier Sixty at any time during a class period, which covers approximately 4,000 different banquet events and begins on November 25, 2002.   *See* July 27

---

[8]      *See, e.g.*, Ex. 9 (1/15/10 Stillwell Dep. 106:25-107:7); Ex. 10 (8/10/09 Margolis Aff. ¶ 1) ("My husband and I contracted with Pier Sixty to host the bar/bat mitzvahs of all three of my children, on October 12, 2002, May 15, 2004, and May 9, 2009, respectively"); Ex. 11 (8/10/09 Kunin Decl. ¶¶ 1-4) ("My firm specializes in event planning for not-for-profit organizations in the New York Metropolitan area.  I have worked in this capacity for 11 years. . . . The clients I work with have sophisticated event planners, or directors of development who have experience negotiating event contracts. . . . Over the years I have booked many events at Pier 60 on behalf of and with clients.").

[9]      Pier Sixty customers testified that a service charge was never understood to be a gratuity. *See, e.g.*, Ex. 12 (2/24/10 Paulen Dep. 11:24-12:4) ("Q: What is your understanding of what a service charge is?  A: A service charge is an add-on to the price per head that goes for other costs and expenses that the venue has."); Ex. 10 (8/10/09 Margolis Aff. ¶ 3) ("I was never of the belief that the service charge was being imposed in lieu of, or was to serve as, a gratuity or 'tip' o[f] any sort for Pier Sixty's service employees."); Ex. 11 (8/10/09 Kunin Decl. ¶ 5) ("[I]n all my years working with Pier Sixty, not a single Pier Sixty representative has ever told me, or implied in any way, that the service charge represented a gratuity for the service staff."); Ex. 13 (7/31/09 Sanders Decl. ¶ 3) ("The service charge did not serve as a gratuity for the service staff, and I never told any of the clients I worked with that the service charge represented a gratuity for the service staff or that any kind of gratuity was otherwise included in their contract price.").

Order, at 2-4.[10]  Neither the representative Plaintiffs nor any other class member worked at every

single banquet event at issue in this case.  Indeed, at approximately more than half of the events

during the class period, *none* of the class representatives worked those events (and thus none of

them could have an individual claim related to that event).  *See* Ex. 14 (1/11/10 Giordano Aff.

¶ 19).  Moreover, approximately 70% of the events during the class period had fewer than 40

class members (less than approximately 8% of the more than 500 total class members) working

at them.  *See* Declaration of Douglas Giordano, dated November 9, 2011 ("11/9/11 Giordano

Decl.") ¶ 1; PSL 27744-27756.

**The Mandatory Service Charge.**  Pier Sixty included a 21% or 22% mandatory service

charge in all of its customer contracts and *at all times* distributed *more than half* of such service

charge to its servers.  *See* Ex. 15 (1/17/11 Giordano Decl. ¶ 2).  The remaining balance was used,

among other things, to pay for other substantial labor and administrative costs associated with

running large banquet events.  *See* Ex. 7 (3/3/10 Giordano Aff., Ex. B).  Pier Sixty used two

versions of their customer contract that remain relevant to this case, Form Contract One (used

until in or about April 2008) and Form Contract Three (used from in or about August 2008

through August 30, 2010).[11]  *See id.* at ¶¶ 17, 19; Ex. 15 (1/17/11 Giordano Decl. ¶ 5).  In the

section regarding the service charge, the Form Contracts state the following:

- <u>Form Contract One</u>:  Under a heading "Service Charge," "22% of food and beverage will be added to your bill."  *See, e.g.*, Ex. 16 (PSL 25683); and

- <u>Form Contract Three</u>:  "All food and beverage items are subject to a 22% service charge.  The service charge is *not* a gratuity and is used to cover personnel, administrative and other costs.  An 8.375% New York State sales tax applies to all

---

[10]    As the Court is aware, Defendants are separately seeking vacatur of the July 27 Order.  Defendants believe that class certification should have been denied on the then-existing brief and record, and even more so now after consideration is given to *Dukes*.  We hereby incorporate by reference all arguments and evidence previously submitted in opposition to that motion.

[11]    In the July 27 Order, the Court found that no reasonable juror could find that the service charge in Form Contract Two (used from approximately April 2008 to August 2008) was purported to be a gratuity.  *See* July 27 Order at 14.

charges." *See, e.g.*, Ex. 17 (PSL 27000).

Defendants worked with sophisticated, expert labor and employment law counsel to draft all three of their contracts and to modify the contract language in light of the *World Yacht* decision.[12]

**Individual Email Communications.**  Defendants produced more than 9,000 pages of emails between Pier Sixty's employees and its customers (or their event planners) in connection with the planning and hosting of approximately 4,000 events over the more than eight-year period covered by this lawsuit.  *See* PSL 2180-10621, PSL 27077-27743.  Plaintiffs have relied upon a small percentage of these event-specific communications with customers, which relate to only approximately 1-2% of the events at issue to try and bolster their claims for class-wide liability.  *See* 2/12/10 Schulman Reply Decl. ¶¶ 9, 10, Ex. 1; 4/13/10 Schulman Decl. ¶ 32, Ex. 21; 6/9/10 Schulman Supp. Decl. ¶¶ 3, 4, Ex. 1.  And critically Judge Sand relied on these very emails in the July 27 Order.  *See* July 27 Order at 3, 13.  Yet, at least eighteen (almost 40%) of the emails cited by Plaintiffs and relied upon by the Court in the July 27 Order, were associated with events that were never actually booked by customers, and thus, no service charge was ever collected.  *See* July 27 Order at 13 (citing to Pl's. Mem. Opp. Summ. J. 12-15); 11/9/11 Giordano Decl. ¶ 2.  In addition, at least six additional such emails relate to events at which no representative Plaintiffs actually worked.  *See* July 27 Order at 13 (citation omitted); 11/9/11 Giordano Decl. ¶ 3.

## ARGUMENT

Class certification orders under Fed. R. Civ. P. 23 are subject to revision as a case progresses.  Rule 23(c)(1)(C) expressly notes that a certification order "may be altered or

---

[12]   That Defendants at all times sought and followed the advice of its sophisticated labor and employment counsel is detailed at length in Defendants' partial motion for summary judgment filed contemporaneously herewith.

amended before final judgment" and the Supreme Court has confirmed that "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982); *see also Sumitomo v. Credit Lyonnaise Rouse*, 262 F.3d 134, 139 (2d Cir. 2001) (district court may "decertify the class whenever warranted").

On a motion for decertification, "the standard of review is the same as a motion for class certification:  whether the Rule 23 requirements are met." *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050, 2011 WL 2682967, at *3 (N.D. Cal. July 8, 2011).  For class certification to be maintained, Plaintiffs must establish:  (i) the class is so numerous that joinder of all members is impracticable; (ii) there are questions of law or fact common to the class; (iii) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (iv) the representative parties will fairly and adequately protect the interests of the class.  *See* Fed. R. Civ. P. 23(a).  In addition, Plaintiffs must demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).

## I.   THE RIGOROUS ANALYSIS REQUIRED BY *DUKES* MANDATES DECERTIFICATION OF THE CLASS IN THIS CASE

*Dukes* teaches that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  131 S. Ct. at 2551.  As one court has already noted, this is a dramatic change to prior practice where Rule 23(a)(2)'s commonality requirement was treated as "not a high bar."  *Rodriguez v. Nat'l City Bank*, No. 08-2059, --- F. Supp. 2d ----, 2011 WL 4018028, at *5 (E.D. Pa. Sept. 8, 2011) (citations and quotation marks omitted).  The bar has now been raised, and the Supreme Court has emphasized the need for district courts to engage in "rigorous analysis" as to whether the proponents of certification have not merely alleged but

actually proved with evidence in the record that the required commonality exists.  131 S. Ct. at 2551; *see also Cruz*, 2011 WL 2682967, at *5 (decertifying class certified pre-*Dukes* and characterizing *Dukes* as "a forceful affirmation of a class action plaintiff's obligation to produce common proof of class-wide liability in order to justify certification").  And since *Dukes*, numerous courts have found commonality to be lacking under the more stringent test.[13]

The July 27 Order, however, treated the threshold question of commonality as hollow and easily-satisfied, stating that "factual differences in the claims of the class do not preclude a finding of commonality," as long as the class "shares even one common question of law or fact." July 27 Order at 23 (citations and internal quotation marks omitted).[14]  Specifically, the Court found that Rule 23's commonality requirement was satisfied because:

---

[13]        *See, e.g.*, *Haynes v. Planet Automall, Inc.*, 09-CV-03880, 2011 U.S. Dist. LEXIS 89640, at **1-2, 3-4, 37 (E.D.N.Y. Aug. 12, 2011) (Weinstein, J.) (denying class certification in action alleging disparate imposition of financing fees under the federal Truth in Lending Act and a New York consumer protection statute, finding that because each negotiation, contract, sales person, and customer was unique, generalized proof failed to satisfy commonality under Rule 23(a)(2)); *Red v. Kraft Foods, Inc.*, No. 10-1028-GW(AGR), 2011 WL 4599833, at *14 (C.D. Cal. Sept. 29, 2011) (denying class certification in case brought under a California consumer-protection statute, finding that even though certain allegedly misleading phrases such as "wholesome" or "sensible snacking" recurred in multiple contexts, plaintiffs attacked thirteen different Kraft products that had a total of fifty-seven different packaging wordings over the course of the proposed class period and the context-specific variations potentially relevant to liability made the class too "fragmented" under *Dukes* to establish commonality); *FPX, LLC v. Google, Inc.*, No. 2:09-CV-142-TJW-CE, --- F.R.D. ----, 2011 WL 4783376, at *7 (E.D. Tex. Sept. 29, 2011) (denying certification in action attacking a uniform practice of Google in dealing with trademarks used as search terms, finding that while Google's practice may have itself been uniform, any resulting liability would not be, because whether or not the practice would cause the requisite "likelihood of confusion" for Lanham Act liability could and would depend on the totality of the other circumstances that vary from trademark to trademark); *Rodriguez*, --- F. Supp. 2d ----, 2011 WL 4018028, at **3, 5-6 (denying certification of home mortgage debtor settlement class under federal law "[i]n light of" *Dukes*, which set a "high bar" to show commonality under Rule 23(a)(2), finding that discretion accorded individual loan officers defeated plaintiffs' ability to use generalized proof).

[14]        The Court also seemed to place significant weight on *Krebs v. Canyon Club, Inc.*, 880 N.Y.S.2d 873, 2009 WL 440903 (N.Y. Sup. Ct. Westchester County Jan. 2, 2009), a New York state court case that had certified a class of plaintiffs asserting NYLL § 196-d claims based on *World Yacht* pursuant to the standard for class certification under New York Civil Practice Law and Rules ("CPLR") – and not binding federal law.  *See* July 27 Order at 25-28. Whether or not *Krebs* was a correct statement of New York state procedural law for class certification, its analysis is fundamentally inconsistent with *Dukes*'s binding construction of Rule 23 for the federal courts.  Whereas *Krebs* asserted that New York's class certification requirements (found in Article 9 of the CPLR) are to be "liberally construed," with the "benefit of any doubt . . . given to allowing the class action," *Dukes* flatly rejects any such thumb on the scales of justice that gives proponents of class certification the benefit of any and all doubts.  *Krebs*, 2009 WL 440903, at *5; *Dukes*, 131 S. Ct. at 2551 ("A party seeking class certification [under Rule 23] must *affirmatively* demonstrate his compliance with the Rule . . . .").

> [C]lass members assert the same legal claim based on *World Yacht* against a service charge policy that was in all material respects nearly identical for each Plaintiff and for each event.  Even granting that there were slight variations in the way the service charge was presented to clients, the service charge was collected and distributed in an essentially uniform manner for each event, providing a common issue of fact.

July 27 Order at 23.  *Dukes* plainly teaches that this was the wrong test.  The manner in which the service charge was collected and distributed here cannot demonstrate commonality.  Indeed, the Supreme Court noted that the *Dukes* class also raised what were literally "common questions of law or fact" but were not the appropriate questions for a proper Rule 23 analysis, such as: "Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?" 131 S. Ct. at 2551.  Rather, as the Supreme Court put it:  "[w]hat matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers apt to drive the resolution of the litigation*." *Id*. (citations and quotation marks omitted).

Thus, for the purpose of Plaintiffs' NYLL claims here, commonality rests on the answer to the question that will drive the resolution of this case:  whether the customer would believe that the mandatory service charge that was collected by Pier Sixty was a gratuity that was entirely for Plaintiffs.  *See, e.g.*, *In re Taco Bell Wage & Hour Actions*, No. 1:07-cv-01314, 2011 WL 4479730, at *5 (E.D. Cal. Sept. 26, 2011) (denying class certification and distinguishing between the alleged common practice – failure to tender a final paycheck to involuntarily terminated employees immediately upon termination rather than at the next regularly scheduled pay date – and the dispositive issue relevant to liability under the particular California statute, whether a particular failure was "willful").  What matters then is what each individual customer booking the specific event believed – an adjudication that the Court in the July 27 Order recognized needed to be made on an "event-by-event basis."  But in determining that these claims could survive summary judgment, the Court specifically relied upon the individualized

email communications had in only approximately 1-2% of the events:

> Our conclusion that summary judgment is inappropriate for events held under Form
> Contracts One and Three is reinforced by Defendants' e-mail representations to
> clients regarding the service charge.  Customers would sometimes refer to the service
> charge as a gratuity, and Pier Sixty sales managers would not correct them to avoid
> confusing them.  (Pl's. Mem. Opp. Summ. J. 12-15.)  When customers inquired about
> the service charge or tipping policies, sales managers would tell them that servers'
> tips were 'covered by' or 'included in' the service charge, or that the service charge
> would go 'directly' to servers, or that the service charge 'compensates the individual
> serving the customer.'  (Pl's. Mem. Opp. Summ. J. 12-15.)  Such representations,
> combined with the paucity of information about the service charge in Form Contracts
> One and Three and Defendants' well-advertised no-tipping policy,[15] could be viewed
> by a reasonable jury to have led reasonable patrons to believe that the entire service
> charge was a gratuity.

July 27 Order at 13.  Plaintiffs' proffer of evidence relating to merely approximately 1-2% of

events, even if probative, is too remote to "generate common *answers* apt to drive the resolution

of the litigation."  *Dukes*, 131 S. Ct. at 2551 (emphasis in original).  This is particularly true here

where a large number of the emails cited by Plaintiffs, and relied upon by the Court do not even

relate to events that were actually booked at Pier Sixty, or relate to events at which none of the

representative Plaintiffs actually worked.  *See* 11/9/11 Giordano Decl. ¶¶ 2, 3.

This case is thus in sharp factual contrast to *Shahriar v. Smith & Wollensky Restaurant

Group*, No. 10-1884-cv, -- F.3d ---, 2011 WL 4436284, at **14-15 (2d Cir. Sept. 26, 2011)

where the Second Circuit concluded that a class of restaurant employees pursuing NYLL claims

could properly be certified.[16]  In that case, the crucial liability issue was *not* what customers had

understood the purpose of the payments that were put into the restaurant's tip pool to be:  indeed,

---

[15]     It is Pier Sixty's policy that servers are not permitted to accept tips from the guests who attend the events
planned and hosted by Pier Sixty's customers (the "no-tipping policy").  *See* Ex. 18 (5/6/11 Marciano Dep. 39:6-17).
This policy is directed to the guests who attend the events, not Pier Sixty's customers.  *See id*. at 40:22-41:3.  This
policy was discussed with counsel, which never advised Pier Sixty that it was unlawful in any respect.  *See id*.
at 99:4-21, 101:16-22.  Pier Sixty also posted one small sign by the coat check area advising guests attending the
event that they are not required to tip the coat check attendant.  *See* Ex. 15 (1/17/11 Giordano Decl. ¶ 6).  The sign
was not directed at Pier Sixty's customers.  *See id*.
[16]     Although *Shahriar* was decided after *Dukes*, the Second Circuit did not address and the parties did not
appear to submit supplemental briefing on *Dukes*.  Indeed, it appears that the Second Circuit has not yet had the
opportunity to consider *Dukes* at all.

there was no dispute that the payments were "gratuities" for purposes of NYLL § 196-d.  It was rather whether or not employees with certain job titles could properly share in that tip pool.  Since the tip pool was consistently shared with allegedly ineligible employees throughout the class period, there – unlike here – the legality of the consistent pattern of distribution was the common question.

## II.   PLAINTIFFS CANNOT DEMONSTRATE COMMONALITY, ESPECIALLY WHERE THEY RELY ON INDIVIDUAL EMAIL COMMUNICATIONS

As stated above, the crux of the critical inquiry for purposes of class certification in this case is the belief of a non-party to this lawsuit:  the "reasonable patron" who actually booked his or her event.  Thus, for purposes of the commonality requirement, the focus is not whether Plaintiffs (Pier Sixty's servers) had a common experience or service charges were collected, taxed, and distributed in a uniform way – they unquestionably were – but rather whether a third party's experience would be common across all of Pier Sixty's events.   As the Court acknowledged in the July 27 Order, "liability will be determined on an 'event-by-event' basis" and *World Yacht*'s "reasonable customer" standard is based on "factors unique to each event." *Id.* at 25-26 (quoting *Krebs*, 2009 WL 440903, at *7).  The Court, however, applying the pre-*Dukes* approach to commonality and relying upon a *Miranda* case cited by Plaintiffs, stated that the reasonable customer test should be so purely objective so as not to require the Court to "closely examine each individual customer's 'frailties or idiosyncrasies.'"  *Id.* at 27 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004)).  This is clearly wrong, especially under *Dukes*.[17]

---

[17]     Consumer protection statutes are much more apt in this case, and case law interpreting those statutes accounts for customer sophistication and other factors.  *See, e.g.*, *Watts v. Jackson Hewitt Tax Serv., Inc.*, 579 F. Supp. 2d 334, 346 (E.D.N.Y. 2008) ("[B]y taking into account what a reasonable consumer would do under the plaintiff[']s particular circumstances," the objective "reasonable consumer" test includes subjective elements); *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 160 (1st Dep't 2010) (test under N.Y. Gen. Bus. L. § 349 is whether representations were "likely to mislead a reasonable consumer acting reasonably under the circumstances").  The

Since the critical issue in this case involves a determination of what these non-party customers reasonably believed, their differences – if not idiosyncrasies – really do matter (even though Defendants believe they will ultimately prevail in all instances).  How a professional event planner would view a mandatory service charge could differ from how that charge is perceived by a father arranging his daughter's wedding.  How a sophisticated business person could view the mandatory, fully-taxed service charge could differ from how a non-profit charity could view it.  How an event planner arranging their 30th event at Chelsea Piers could perceive things is possibly different from how a first time customer planning their anniversary party could understand the arrangement.  How a customer with extensive experience in the banquet and restaurant industry could perceive the mandatory service charge could well differ from the perceptions of a social customer with no background in this area.  And potential differences go on.  Under *Dukes*, these differences preclude a finding of commonality.

Moreover, Plaintiffs (and the Court's) interjection of specific evidence pertaining to specific events, namely, emails that purportedly supported a finding that class certification was appropriate and a denial of Defendants' motion for summary judgment with respect to Form Contracts One and Three only exacerbates this problem.  Not only does the reliance on this type of individualized proof undercut Plaintiffs' assertion of commonality, but it is simply defective for the purpose offered.  Like the evidence offered in *Dukes*, which was actually stronger since it applied to 7% of the claimed acts at issue, the anecdotal evidence submitted by Plaintiffs is simply "too weak to raise any inference that all of the individual" actions give rise to liability. 131 S. Ct. at 2556.

Many of the emails between Pier Sixty's sales managers and customers could not support

---

test that should be applied here is an objective one with subjective elements, taking into account the level of sophistication of the particular customer, the type of event being held (corporate, philanthropic, social milestone event), and the customer's prior knowledge and experience and use of an event planner.

-14-

a finding that Pier Sixty's customers were led to believe, or in fact believed, that the mandatory service charge was a gratuity that would be paid in its entirety to the servers. For example, when an event planner referred to the service charge as a gratuity, Pier Sixty's sales managers corrected them. *See, e.g.*, Ex. 19 (PSL 4361) (Event Planner: "The budget we've been given to work with is between $100.00 and $125.00 per person (plus gratuity and tax)." Sales Manager: "I will certainly meet the $125.00 plus 22% service charge and tax."); *see also, e.g.*, Ex. 20 (PSL 4671, PSL 5159, PSL 5278, PSL 5358, & PSL 5539).

Plaintiffs also cite emails in which Pier Sixty's sales managers stated, for example, that "[a]ll of the servers, captains, bartenders, restroom/coatcheck attendants etc are covered by the service charge," which is a true statement in that the servers always received more than half of the service charge (and the remainder was used to defray other substantial costs associated with the events). Ex. 21 (PSL 7409).[18] The Court recognized as much in the July 27 Order, concluding that these types of emails were, at best, "ambiguous." July 27 Order at 14 n.7 (citing, as an example, PSL 8433 (Ex. 23), where a sales manager told a customer that the tip for all other staff besides the banquet manager was "covered by the service charge").

Even though a very small (and statistically insignificant) number of emails cited by Plaintiffs and relied upon by the Court contain sloppy language, these documents cannot lead to the conclusion that these customers would have been misled into believing that 100% of the service charge was paid just to the servers. *See, e.g.*, Ex. 24 (PSL 4858) (Q: "Are gratuities included in the contract for the staff or is that handled separately?" A: "Our 22% service charge

---

[18]     *See also* Ex. 22 (PSL 9576) (Pier Sixty Customer: "What about the 22% service charge we are paying, does that not cover the bartenders, etc?" Sales Manager: "The 22% service charge does cover your service staff."); (PSL 5633) (the service charge "covers all the waitstaff, bartenders, coatcheck, etc.").

*does cover all the gratuities* for the servers, bartenders, coatcheck and restroom attendants.").[19]

Even where a sales person mistakenly called the service charge a "gratuity" does not alter the result;[20] indeed, it highlights how every event must be evaluated on its own merits.  Dispositively here, these emails simply cannot be used as a basis to extrapolate the experience of a few customers to the thousands of others who had their own distinctive experiences in booking their events.

To the extent that this was ever an appropriate approach, it is now plainly contrary to law. *Dukes* firmly rejected the plaintiffs' attempts in that case to sidestep the unrebutted evidence of Wal-Mart's national policy of compliance with applicable law by alleging a *de facto* national policy of discriminatory practices.  This tactic was based on "anecdotal evidence," which the Court rejected as wholly inadequate as a matter of law.  *See Dukes*, 131 S. Ct. at 2556.  Although plaintiffs in *Dukes* had submitted over a hundred affidavits specifying alleged instances of discriminatory conduct, the anecdotes "relat[ed] to only some 235 out of Wal-Mart's 3,400 stores," only 7% of the claimed acts at issue.  *Id.*  That was insufficient to provide any rational basis for assuming such behavior was typical or uniform and thus could not provide classwide proof of any common liability issue.  *See id.*  Plaintiffs' attempt here to use a smattering of unrepresentative (and ultimately non-probative) emails to establish liability for other events to which they do not relate is not only fundamentally unfair and at odds with what actually happened, but it is also precisely the approach that *Dukes* expressly forbids.

## III.   PLAINTIFFS LACK TYPICALITY, WHICH REQUIRES DECERTIFICATION

As the Court noted in *Dukes*, lack of commonality tends to undermine typicality as well,

---

[19]     *See also* Ex. 25 (PSL 4873) (Q: "[W]e remember you saying certain gratuities were included in our contract . . . [c]an you let us know which ones?"  A: "Yes, all the Gratuities are included for our staff, servers, bartenders, coat check & restroom attendants."); Ex. 26 (PSL 5196-97) (Q: "Just to confirm – service charge includes tips for coat check attendant, restroom attendant, people servicing the tables, the bartender, buffet station person (if required), yes?"  A: "And yes, all the gratuities for the staff is [sic] included in the service charge . . . .").
[20]     *See, e.g.*, Ex. 27 (PSL 3743).

but here the typicality issue has an additional consequence.  *See id.* at 2551 n.5.  Even if it were possible to lump together the events at which one or more of the class representatives personally worked (and could thus prosecute an individual NYLL claim), there are even more events at which none of the seven representative plaintiffs has an individual claim.  *See* Ex. 14 (1/11/10 Giordano Aff. ¶ 19).  Indeed, at least six of the emails cited by Plaintiffs and relied upon by the Court in the July 27 Order do not relate to an event at which any of the representative Plaintiffs even worked.  *See* 11/9/11 Giordano Decl. ¶ 3.

In the July 27 Order, the Court even without the benefit of *Dukes*, viewed it as something of a close call – *i.e.*, "[t]he more difficult question" – whether those events where Plaintiffs did not work (*i.e.*, approximately more than half) could be included in the class.  July 27 Order at 26. *Dukes* makes that issue no longer close.  Because of event-to-event variations, it is entirely possible that a jury doing the necessary "event-by-event" analysis could find liability for one of the thousands of events at which none of the class representatives worked based on some "unique factor" not present in any event at which a class representative had worked.  *Dukes*, 131 S. Ct. at 2556.  For example, a jury could find lack of liability for a single event based on a unique email (providing supplemental detail about the nature of the charges) not present in any event at which any class representative had worked.  None of these Plaintiffs can possibly be typical or adequate representatives for the servers who worked at such events and whose right to recover for such events under the NYLL stands or falls based on factors not relevant to any individual claim possessed by any class representative.

A similar issue recurs in securities class action litigation, where would-be class representatives frequently attempt to sue on behalf of purchasers of various groups of related securities of the same issuer without having personally purchased each separate type of security.

For example, in *In re Wachovia Equity Securities Litig.*, 753 F. Supp. 2d 326, 369-70 (S.D.N.Y. 2011), decided after the July 27 Order, the various named plaintiffs had only personally acquired securities in 16 out of 30 of the offerings at issue (all from the same issuer) and the court rejected their attempt to bring any claims as to the remaining 14 offerings.[21]  Plaintiffs argued that the allegedly misleading statements at issue had been included in shelf registration statements used for both the offerings in which they had made purchases and those in which they had not, thus creating common questions bearing on liability for all of the offerings, but to no avail.[22]  For the same reasons, no class certified here can encompass the multitude of events at which none of the class representatives worked and thus as to which none of the class representatives suffered any injury as a result of inadequate disclosure, if any, to the customer who paid the service charge for that event.

## IV.   NUMEROSITY IS ALSO LACKING FOR THE OVERWHELMING MAJORITY OF EVENTS IN THE CLASS PERIOD

Because commonality cannot be established across events in light of the Supreme Court's clarification of Rule 23 in *Dukes*, Plaintiffs have a significant numerosity problem as well.  As the Court observed in the July 27 Order, the numerosity requirement of Rule 23(a)(1) may presumptively be satisfied if the putative class has 40 or more members.  *See* July 27 Order at 23-24 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). However, as noted above, approximately 70% of the events during the class period had fewer

---

[21]     This issue was resolved at the motion to dismiss stage before any motion for class certification had been filed.  The plaintiffs sought to defer the issue until class certification on the grounds that it was part of Rule 23's typicality inquiry, but the court elected not to postpone the issue.  *See Wachovia*, 753 F. Supp. 2d at 369.  *A fortiori*, the court's analysis requires the conclusion that these plaintiffs could not, on typicality grounds, have been representatives for a class that reached the offerings in which they had not personally purchased securities.

[22]     *See also In re Salomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d 579, 607-08 (S.D.N.Y. 2006) (rejecting at threshold motion stage attempt by proposed class representatives who only owned shares in 20 of 88 funds operated by defendants as to other 68 funds, despite allegations of uniform misconduct as to sales practices and excessive fees related to all 88 funds); *Nenni v. Dean Witter Reynolds, Inc.*, No. 98-12454-REK, 1999 WL 34801540, at *2 (D. Mass. Sept. 29, 1999) (would-be lead plaintiff could not pursue claims with respect to 41 affiliated funds when he only purchased shares in four of them, despite allegations that prospectuses of all 41 funds were legally and factually deficient in the same manner).

than 40 class members (or less than approximately 8% of the total class members) working at them.  *See* 11/9/11 Giordano Decl. ¶ 1.  Given the lack of commonality between different events as to the facts dispositive of liability, the memberships of these varying groups (the employees staffed to specific events) are too small for certification on a stand-alone basis to satisfy the numerosity requirement.  *See, e.g.*, *Lin v. Benihana Nat'l Corp.*, 275 F.R.D 165, 178 (S.D.N.Y. 2011) (denying motion for class certification of NYLL claims and holding that even a narrower subclass would separately be required to satisfy the numerosity requirement of Rule 23(a)(1)).

## <u>CONCLUSION</u>

For all of the foregoing reasons, the motion should be granted, the class decertified, and a status conference scheduled to discuss the most efficient resolution of the individual Plaintiffs' surviving individual claims.

Dated:   New York, New York
         November 9, 2011

Respectfully submitted,

FRIED, FRANK, HARRIS, SHRIVER &
   JACOBSON LLP


By: /s/ Douglas H. Flaum
    Douglas H. Flaum, Esq.
    Lisa H. Bebchick, Esq.
    One New York Plaza
    New York, New York 10004
    Telephone:  (212) 859-8000
    douglas.flaum@friedfrank.com
    lisa.bebchick@friedfrank.com

FOX ROTHSCHILD LLP

    Carolyn D. Richmond, Esq.
    Eli Z. Freedberg, Esq.
    100 Park Avenue, Suite 1500
    New York, New York 10017
    Telephone:  212-878-7900

*Counsel for Defendants*
*Pier Sixty, LLC and James Kirsch*